UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION<br><br>Plaintiff,<br><br>-against-<br><br>MERRILL LYNCH & CO., INC., *ET AL.*<br><br>Defendants. | No. 11 CIV. 06202 (DLC) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP

Philippe Z. Selendy
Sascha N. Rand
Manisha M. Sheth
Andrew R. Dunlap

51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing
Finance Agency, as Conservator for Fannie
Mae and Freddie Mac*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND ................................................................................6

I.     MLPFS'S DILIGENCE ON WLTD SECURITIZATIONS.................................................8

     A.     MLMI Conducted No Independent Diligence, And Its Actions Were Entirely Directed And Controlled By MLPFS.................................................9

     B.     MLPFS Conducted No Diligence When Securitizing WLTD Loans.....................9

     C.     MLPFS's Diligence Teams Did Not Verify The Representations In The WLTD Securitizations' Prospectus Supplements...................................................12

     D.     MLPFS Conducted No Diligence—Either Through A Direct Review Or Statistically Representative Sampling—For The Vast Majority Of Loans In The SLGs...................................................14

          1.     MLPFS Conducted Diligence On Samples Of Acquisition Loan Pools, Not Of Loans Selected For Securitization ......................................14

          2.     MLPFS's Sample Sizes Were Not Scientifically Determined And Were Often Lowered To Accommodate Originators.................................15

          3.     MLPFS Did Not Select Samples That Were Representative Or That Included All Loans That Met The Adverse Criteria.........................15

          4.     MLPFS Did Not Extrapolate Its Diligence Results To The SLGs As A Whole...................................................16

          5.     MLPFS Conducted No Diligence Beyond Its Acquisition Pool Samples...................................................17

     E.     The WLTD Retained Third-Party Vendors To Perform Loan Level Diligence But Failed To Provide Them With Adequate Instructions And Guidance, And Routinely Securitized Loans That The Vendors Identified As Defective...................................................18

          1.     The WLTD's Diligence Teams Had Serious Concerns About The Competence Of Their Third-Party Diligence Vendors And The Quality Of Their Work...................................................19

          2.     The WLTD Diligence Teams And WLTD Traders Would Often "Overturn" Vendors' Recommendations Not To Buy Loans...................19

i

F.      The WLTD Traders Directed The WLTD Diligence Team To Conduct Only Minimal Diligence On First Franklin And Ownit Loans After 2006 ..........22

G.      MLPFS Was Concerned About The Staffing Level Of The WLTD's Subprime Diligence Group Yet Did Not Hire Any Additional Personnel............25

II.     MLPFS'S DILIGENCE ON THIRD-PARTY SECURITIZATIONS .............................26

III.    MLPFS'S DILIGENCE ON THE SURF SECURITIZATIONS ....................................28

A.      SURF's Diligence Process Was Not Targeted To Ensuring That Loans Adhered To SURF's Published Seller Guidelines ..................................................28

B.      SURF Did Not Have Confidence In Its Third-Party Vendor................................31

C.      SURF Often Overturned Its Vendor's Recommendations To Exclude Loans That Did Not Comply With SURF's Underwriting Guidelines.................31

ARGUMENT ...................................................................................................................32

I.      MLMI HAS NO DUE DILIGENCE DEFENSE AS A MATTER OF LAW .................33

II.     MLPFS'S DILIGENCE WAS INADEQUATE AS A MATTER OF LAW ...................34

A.      MLPFS Faces A Heightened Burden Of Proof Because It Was Completely Intertwined With Merrill Lynch's Issuer, MLMI ..................................................35

B.      MLPFS Failed To Conduct A Reasonable Investigation Up To The Effective Date Of The Prospectus Supplements....................................................38

C.      MLPFS Failed To Conduct Any Diligence On The Statements In The Prospectus Supplements.......................................................................................40

D.      MLPFS Failed To Conduct Any Investigation As To The Vast Majority Of Loans In The SLGs ..........................................................................................42

E.      MLPFS's Diligence Was Inadequate As A Matter Of Law .................................45

1.      Despite Serious Concerns About The Work Performed By Its Diligence Vendors, The WLTD Failed To Review The Loans That Its Vendors Identified As Complying With Guidelines............................46

2.      The WLTD Actively Facilitated The Securitization Of Loans That Did Not Meet Underwriting Guidelines .....................................................47

3.      The WLTD Ignored Red Flags Related To Loans Originated By First Franklin And Ownit..........................................................................49

        4.      The WLTD's *Ad Hoc* Diligence Procedures Are Insufficient As A Matter Of Law To Prove Its Due Diligence Defense ...............................50

   F.     MLPFS Conducted Only Cursory Diligence—And Sometimes No Diligence At All—On The Third-Party Securitizations .......................................54

   G.    For The SURF Securitizations, MLPFS Ignored Red Flags In Purchasing Non-Conforming Loans And Distrusting Its Diligence Vendor...........................56

III.   MLPFS AND MLMI DID NOT EXERCISE REASONABLE CARE AS A MATTER OF LAW ...........................................................................................................58

CONCLUSION....................................................................................................................61

## <u>TABLE OF AUTHORITIES</u>

**Page**

### <u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................32

*Brady v. UBS Fin. Servs., Inc.*,
2013 WL 1309250 (N.D. Okla. Mar. 26, 2013) ...................................................37

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................................................32

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*,
480 F.2d 341 (2d Cir. 1973)...................................................................................34

*Demarco v. Edens*,
390 F.2d 836 (2d Cir. 1968)...................................................................................61

*Dukes v. Wal-Mart Stores, Inc.*,
603 F.3d 571 (9th Cir. 2010) (en banc) ................................................................43

*Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade Cnty.*,
943 F. Supp. 1546 (S.D. Fla. 1996) .......................................................................43

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ..................................................................44

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)................................................................................................34

*Escott v. BarChris Constr. Corp.*,
283 F. Supp. 643 (S.D.N.Y. 1968) .............................................35, 38, 41, 56

*FDIC v. Giammettei*,
34 F.3d 51 (2d Cir. 1994)........................................................................................33

*Feit v. Leasco Data Processing Equip. Corp.*,
332 F. Supp. 544 (E.D.N.Y. 1971) ............................................................... passim

*FHFA v. Bank of America Corp.*,
2012 WL 6592251 (S.D.N.Y. Dec. 18, 2012) .......................................................58

*FHFA v. HSBC N. Am. Holdings Inc.*,
--- F. Supp. 2d ----, 2013 WL 6480445 (S.D.N.Y. Dec. 10, 2013)........................38

*FHFA v. HSBC N. Am. Holdings Inc.*,
--- F. Supp. 2d ----, 2013 WL 6588249 (S.D.N.Y. Dec. 16, 2013)........................58

*FHFA v. JPMorgan Chase & Co.*,
2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012) ........................................................53

*FHFA v. UBS Americas, Inc.*,
    858 F. Supp. 2d 306 (S.D.N.Y. 2012)................................................................33, 51

*FHFA v. UBS Americas, Inc.*,
    2012 WL 2400263 (S.D.N.Y. June 26, 2012) ...............................................38

*Franklin Sav. Bank of N.Y. v. Levy*,
    551 F.2d 521 (2d Cir. 1997)......................................................................58, 59, 60

*Glassman v. Computervision Corp.*,
    90 F.3d 617 (1st Cir. 1996)........................................................................38

*Golden Pac. Bancorp v. FDIC*,
    375 F.3d 196 (2d Cir. 2004).......................................................................32

*Heffernan v. Pac. Dunlop GNB Corp.*,
    965 F.2d 369 (7th Cir. 1992) .....................................................................59

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)...............................................................................32, 34

*Junker v. Crory*,
    650 F.2d 1349 (5th Cir. 1981) ...................................................................59

*In re Livent, Inc. Noteholders Sec. Litig.*,
    355 F. Supp. 2d 722 (S.D.N.Y. 2005)......................................................... passim

*In re Metlife Demutualization Litig.*,
    262 F.R.D. 217 (E.D.N.Y. 2009)................................................................59

*MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/Am. Express, Inc.*,
    886 F.2d 1249 (10th Cir. 1989) .................................................................58

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010).......................................................................33

*In re Software Toolworks Inc.*,
    50 F.3d 615 (9th Cir. 1995)...................................................................38, 58, 60

*Univ. Hill Found. v. Goldman, Sachs & Co.*,
    422 F. Supp. 879 (S.D.N.Y. 1976) ...................................36, 44, 45, 46, 49, 59, 60

*In re WorldCom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004)......................................................... passim

*In re WorldCom, Inc. Sec. Litig.*,
    2005 WL 638268 (S.D.N.Y. Mar. 21, 2005) ..............................................36, 45

## Statutes, Rules, and Regulations

15 U.S.C. § 77b(a)(4).............................................................................................33

15 U.S.C. § 77k(b) ..................................................................................................33

15 U.S.C. § 77k(b)(3)(A) ................................................................................... passim

15 U.S.C. § 77k(c) .............................................................................................57

15 U.S.C. § 77*l*(a)(2) .........................................................................................60

D.C. Code § 31-5606.05(a)(1)(B) .....................................................................58

Va. Code Ann. § 13.1-522(A) ...........................................................................58

17 C.F.R. § 230.176(g) ......................................................................................36

17 C.F.R. § 230.191(a) .......................................................................................33

17 C.F.R. § 230.430B(f)(1).................................................................................38

Fed. R. Civ. P. 56(e) ..........................................................................................32

## Miscellaneous

1 Thomas Lee Hazen,
    Law of Sec. Reg. § 7.4[2][A][1] (4th ed. 2002) ......................................36

Webster's New International Dictionary of the English Language 1306 (2d ed. 1934)...............50

Plaintiff Federal Housing Finance Agency ("FHFA"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" and, together with Fannie Mae, the "GSEs"), respectfully submits this memorandum of law in support of its Motion for Partial Summary Judgment.

## PRELIMINARY STATEMENT

Merrill Lynch's investigation of the loans underlying the residential mortgage-backed securities at issue was so patently deficient—not independent of the issuer, not conducted at the time of securitization, not designed to test the veracity of the prospectus supplements, not responsive to "red flags" raised about the competence of third-party vendors, and consisting of *ad hoc* procedures that did not examine the vast majority of securitized loans—that Merrill Lynch's efforts were unreasonable as a matter of law.  As a result, Merrill Lynch cannot prevail on either a "due diligence" defense under Section 11 of the Securities Act or a "reasonable care" defense under Section 12 and parallel provisions of the Virginia and D.C. Blue Sky Acts.

The central player in Merrill Lynch's diligence efforts was defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS"), which acted as underwriter or co-lead underwriter for all of the 72 securitizations at issue (the "Securitizations").  For 59 Securitizations—47 "WLTD Securitizations" and 12 "Third-Party Securitizations"—Merrill Lynch's underwriter purported to conduct diligence through its Whole Loan Trading Desk ("WLTD").  For the remaining 13 "SURF Securitizations," MLPFS claimed to conduct diligence through its Specialty Underwriting and Residential Finance ("SURF") desk.  Merrill Lynch Mortgage Investors ("MLMI") issued the 60 WLTD and SURF Securitizations.  Because it is an issuer, MLMI has no due diligence defense as a matter of law for these 60 Securitizations.  15 U.S.C. § 77k(b).

Underwriters must make an "independent verification of the [issuer's] representations." *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004).  Underwriters

cannot simply "rely on [an issuer's] assurances," but rather must "play devil's advocate[.]" *Id.* at 76 (citations and quotations omitted).  Merrill Lynch's initial difficulty in meeting this standard is that its underwriter and issuer—affiliates within the same corporate structure—were not independent.  The Merrill Lynch issuer had no employees, and all but one of its directors were employees of Merrill Lynch's underwriter.  MLMI had no business operations, financial records, or even office space apart from the Merrill Lynch underwriter.  MLMI's only function was to create securitizations that the underwriter would distribute.  MLPFS employees selected the loans that the issuer would securitize.  As a practical matter, MLMI *was* MLPFS.  But Merrill Lynch could not play "devil's advocate" with itself; consequently, MLPFS must be held to a higher standard than might apply to an independent underwriter, such that its "liability approaches that of the issuer [MLMI] as guarantor of the accuracy of the prospectus."  *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 581 (E.D.N.Y. 1971) (Weinstein, J.) (defendants with intimate knowledge of the issuer are held to "stringent requirements of knowledge of corporate affairs … liability will lie in practically all cases of misrepresentation").

Even if MLPFS were held to the same standard as an independent underwriter, the undisputed facts prove that the Merrill Lynch underwriter did not conduct either reasonable or legally required diligence of the WLTD Securitizations.  *First*, the underwriter performed no diligence on loans when they were securitized, only when the WLTD was acquiring them. MLPFS performed no additional diligence on those loans during the months between acquisition and securitization.  As a result, the underwriter did not perform diligence on the actual Supporting Loan Groups ("SLGs") that MLMI securitized, and MLPFS ignored post-acquisition information that could bear on the accuracy of statements in the Prospectus Supplements, including credit reports that could show previously undisclosed debts and new documents that

could show properties were not occupied by their owners.  This failure to conduct post-acquisition due diligence violates the plain language of Section 11, which requires an investigation "at the time such part of the registration statement became effective."  15 U.S.C. § 77k(b)(3)(A); *In re WorldCom*, 346 F. Supp. 2d at 677 ("[a] failure by the underwriters … to consider new information up to the effective date of an offering would almost certainly constitute a lack of due diligence.") (internal citations and quotation marks omitted).

*Second*, MLPFS's due diligence employees testified that the diligence performed when the WLTD acquired loans was not designed to verify the accuracy of representations in the WLTD Securitizations' Prospectus Supplements.  This failure to verify the accuracy of the representations in the Prospectus Supplements violates Section 11's requirement that underwriters investigate the "statements" in the registration statements.  15 U.S.C. § 77k(b)(3)(A); *see In re Livent, Inc. Noteholders Sec. Litig.*, 355 F. Supp. 2d 722, 737 (S.D.N.Y. 2005) (no due diligence defense where defendants "completely relied on … outside personnel to ensure the Registration Statement's accuracy").

*Third*, Merrill Lynch's underwriter performed no diligence at all on the vast majority of the loans in the WLTD Securitizations.  MLPFS's diligence employees preferred to review all loans that the WLTD acquired, but the underwriter's traders limited diligence reviews to samples of loan pools.  The number of loans sampled was often determined by the traders' agreement with originators.  As a result, very small portions of the loans backing the SLGs were subject to diligence when they were acquired, and at times none of the loans were reviewed.  The WLTD also was supposed to select a portion of its sample using "adverse" criteria that identified the riskiest loans in the pool, but the WLTD used an *ad hoc* approach that was, in the words of one MLPFS due diligence employee, "more art than science."  As a result, MLPFS did not examine

all loans that it had identified as risky.  Unsurprisingly, the traders on the WLTD could not and did not ascertain whether such sampling was statistically representative, such that the results could be extrapolated to the entire loan pool, much less the SLGs they created that were actually securitized.  The WLTD's traders therefore had no understanding of the quality of the loans that they bought that were not included in the narrow samples, and were therefore equally blind to the overall quality of the loans that ultimately served as collateral for the WLTD Securitizations. This rickety system fails as a matter of law to demonstrate the "thorough" and "searching inquiry" with "systematic attention to detail and relationship" that is required of an underwriter. *In re WorldCom*, 346 F. Supp. 2d at 678 (quotation marks omitted).

*Fourth*, even though MLPFS's diligence personnel concluded that MLPFS's third-party diligence vendors were making "serious mistakes," were "very scared" of the vendors' work, and did not "think they have done anything right since we started back using them," the underwriter conducted no loan file reviews to determine whether the vendors were properly grading loans as eligible for purchase and securitization (EV1s and EV2s).  Rather, Merrill Lynch's underwriter simply securitized all such loans.  As such, MLPFS ignored its duty as an underwriter to "look deeper and question more when confronted with red flags."  *In re WorldCom*, 346 F. Supp. 2d at 677 (quotations and citation omitted).

*Fifth*, the core function of MLPFS's diligence personnel was not to identify and remove loans that did not comply with originators' guidelines, as would have been appropriate for a genuine diligence process.  Rather, and in sharp contrast to those loans graded EV1 or EV2, MLPFS's diligence personnel believed their core function to be to review "the widest swath" of loans that the vendors found ineligible for securitization (EV3s), with the sole purpose of "overturning" the vendors' assessment to the fullest extent possible, so that the loans could be

purchased and securitized.  And even when the diligence teams agreed with their vendors that a loan was not suitable for securitization, the traders overturned the unsuitability assessment so often that it "[m]akes you wonder why we have due diligence performed other than making sure the loan closed."  By securitizing loans its own diligence team believed should not be securitized, the underwriter "actively facilitated" improper representations in the Prospectus Supplements.  *See In re Livent*, 355 F. Supp. 2d at 736.

*Sixth*, after Merrill Lynch acquired ownership interests in the originators Ownit and First Franklin, MLPFS ignored warning signs raised by its own diligence department about the quality of those originators' loans.  Rather than address these warning signs, Merrill Lynch's underwriter *reduced* its diligence of those originators' loans, viewing such efforts as a "wasted cost" for First Franklin and unnecessary for Ownit because Merrill Lynch was its "friend."  Merrill Lynch cannot prevail on a due diligence defense by burying its head in the sand.  *In re Livent*, 355 F. Supp. 2d at 738 ("[B]lind reliance on others does not substitute for the due diligence that defendants must demonstrate to avoid Section 11 liability.").

MLPFS's diligence for the loans supporting the Third-Party and SURF Securitizations suffered from many of the same defects, and then some.  For the Third-Party Securitizations, MLPFS chose even lower sample sizes, conducting no diligence at all on any of the loans in the SLGs for one of the Third-Party Securitizations and reviewing less than 10 percent of the loans for nine others.  For the SURF Securitizations, the Prospectus Supplements represented that securitized loans generally complied with SURF's underwriting guidelines but, contrary to that representation, MLPFS often compared the loans it acquired not to those guidelines, but to undisclosed "negotiated criteria" that were inconsistent with SURF's published guidelines.

For these reasons, FHFA respectfully requests that the Court find that MLPFS, Merrill

Lynch's underwriter, does not have any sufficient basis to establish a due diligence defense

under Section 11 or a "reasonable care" defense under Section 12 and the Blue Sky Acts for any

of the 72 Securitizations.  FHFA further requests that, because there is no evidence that any

Defendant other than MLPFS conducted diligence, the Court enter partial summary judgment for

FHFA on these defenses as to each Defendant.

## **FACTUAL BACKGROUND**

Fannie Mae and Freddie Mac purchased from Merrill Lynch certificates (the "GSE

Certificates") from 72 residential mortgage-backed securitizations (the "Securitizations").

Plaintiff's Statement of Undisputed Material Facts ("SUF") ¶ 54.  Those Securitizations fall into

three groups: (1) 47 Securitizations backed by loans purchased by Merrill Lynch's[1] WLTD,

located in New York, for which MLMI served as the issuer and MLPFS served as the

underwriter (the "WLTD Securitizations") (SUF ¶¶ 60, 62);[2] (2) 13 Securitizations backed by

loans acquired by Merrill Lynch's SURF desk, located in Minneapolis, for which MLMI served

as the issuer and MLPFS served as the underwriter (the "SURF Securitizations") (SUF ¶¶ 63-

64); and (3) 12 Securitizations backed by loans acquired or originated by entities unaffiliated

with Merrill Lynch, issued by third-party entities with MLPFS serving as lead or co-lead

underwriter (the "Third-Party Securitizations") (SUF ¶¶ 65-66).[3]

---

[1]  "Merrill Lynch" or "Defendants" refers to Merrill Lynch and Co., Inc., together with the following subsidiaries:
Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS"), Merrill Lynch Mortgage Investors ("MLMI"), Merrill
Lynch Mortgage Lending, Inc. ("MLML"), Merrill Lynch Mortgage Capital, Inc. ("MLMC"), First Franklin
Financial Corp. ("First Franklin"), and Merrill Lynch Government Securities, Inc. ("MLGSI").
[2]  Of these 47 Securitizations, 41 were backed by subprime mortgage loans and six were backed by prime and Alt-A
mortgage loans.  SUF ¶ 61.
[3]  Appendix A attached hereto identifies, on a securitization-by-securitization basis, the sponsor, depositor,
underwriter and collateral type for each Securitization.  Because all of the Securitizations were purchased between
September 29, 2005 and October 10, 2007 (First Am. Compl. ¶ 2), the discussion herein only refers to Merrill
Lynch's practices from January 1, 2005 until October 31, 2007, unless otherwise noted.

Merrill Lynch offered and sold each of the GSE Certificates pursuant to a Shelf Registration Statement and a Prospectus Supplement.  SUF ¶ 54.  The Prospectus Supplements included representations concerning the Securitizations and the mortgage loans collateralizing them, including that the loans were generally underwritten in accordance with applicable underwriting guidelines.  SUF ¶¶ 55-56.[4]  The Prospectus Supplements also made representations about the loan-to-value ratios ("LTV") and combined loan-to-value ratios ("CLTV") of the loans backing the Securitizations, the number or percentage of those loans secured by owner-occupied residences, as well as the credit ratings of the GSE Certificates.  SUF ¶¶ 57-59.

Merrill Lynch was supposed to conduct three different types of diligence in connection with the Securitizations:  credit, compliance, and valuation.  SUF ¶ 67.  *Credit diligence* was supposed to evaluate whether a loan had been originated in accordance with the credit requirements of the originator's underwriting guidelines,[5] including looking for "red flags" of fraud or misrepresentations in the borrower's assets, liabilities, employment status, and occupancy of the property; *compliance diligence* was supposed to focus on whether a loan had been originated in accordance with state or federal law; and *valuation diligence* was supposed to evaluate whether the subject property's appraised value was reasonable and accurate.  SUF ¶¶ 69-72.  Credit and compliance diligence involved reviewing the loan origination file, while

---

[4]  *See also* Declaration of Tyler G. Whitmer In Support Of Plaintiff's Partial Motion For Summary Judgment ("Whitmer Decl.") Ex. 90 (Expert Report of Joseph Little dated January 23, 2014 (the "Little Report")) ¶ 38 ("Prospectus supplements regularly stated that the securitized loans were underwritten 'generally' or 'substantially' in accordance with the relevant underwriting guidelines.").

[5]  The underwriting guidelines of originators typically contained credit requirements to assess the credit risk presented by the loan, such as minimum credit scores, maximum debt-to-income ("DTI") ratios, and maximum LTV and CLTV ratios.  SUF ¶ 70.

valuation diligence generally involved using automated-valuation models ("AVMs"), desk reviews, drive-by appraisals, and/or broker-price opinions ("BPOs").  SUF ¶ 73.[6]

## I.   MLPFS'S DILIGENCE ON WLTD SECURITIZATIONS

The WLTD was part of MLPFS's Residential Real Estate Platform.  SUF ¶ 17.  Vince Mora and Matthew Whalen were co-heads of the platform, with Mr. Mora overseeing the WLTD and Mr. Whalen overseeing the structuring desk.  SUF ¶ 18.  Within the WLTD, Diane Alexander headed the group that was responsible for conducting diligence on subprime loans, (SUF ¶ 21), and Gregory Amoroso headed the group that was responsible for conducting diligence on prime and Alt-A loans (SUF ¶ 23).  Ms. Alexander's group reported to Mr. Mora, who was also MLPFS's senior-most subprime whole loan trader.[7]  SUF ¶¶ 18, 24.  Mr. Amoroso's group reported to Brian Brennan, MLPFS's most senior trader purchasing pools of prime and Alt-A loans; Mr. Brennan reported to Mr. Mora.  SUF ¶ 25.  Neither Ms. Alexander's group nor Mr. Amoroso's group reported to Merrill Lynch's risk management group.  SUF ¶ 26.[8]

---

[6]   AVMs are models employed to ascertain estimates of the market value of a property.  SUF ¶ 74.  If the valuation was within a certain variance, the WLTD diligence teams considered the appraised value of the subject property to be accurate and reasonable.  SUF ¶¶ 72, 76.  If the valuation exceeded a certain variance, the WLTD diligence teams would perform a desk review.  SUF ¶¶ 73,75.  A desk review was supposed to be an independent review of the appraisal associated with the subject property.  SUF ¶ 76.  If the desk review did not resolve the variance, the WLTD diligence team would conduct a BPO or drive-by.  SUF ¶ 77.  In contrast to a desk review for a loan, a BPO or drive-by was supposed to consist of an actual review of the subject property.  SUF ¶ 77.  While Merrill Lynch typically performed valuation diligence on subprime loans, there is no evidence that it performed valuation diligence on prime or alt-a loans. SUF ¶ 68.  Moreover, there is no evidence that Merrill Lynch ever recalculated LTV ratios where valuation diligence suggested a lower value for the property, though there is some evidence that diligence personnel would recalculate LTV ratios based upon the results from valuation diligence to lower the LTV ratio to make the loan meet the guideline.  SUF ¶ 78.

[7]   While Ms. Alexander earned a base salary of ▇▇▇▇▇ in 2005 and 2006, she received a bonus of ▇▇▇▇ in 2005 and ▇▇▇▇ in 2006.  SUF ¶ 36.  Mr. Mora earned a base salary of ▇▇▇▇ in 2005 and 2006, and received bonuses of ▇▇▇▇ in 2005 and ▇▇▇▇ in 2006.  SUF ¶ 34.  Ms. Alexander's and Mr. Mora's bonus depended, in part, on the profitability of MLPFS.  SUF ¶ 37.

[8]   In fact, Merrill Lynch's risk management group played no role in the WLTD's diligence process.  SUF ¶ 27.

REDACTED

## A.   MLMI Conducted No Independent Diligence, And Its Actions Were Entirely Directed And Controlled By MLPFS

While an issuer throughout the relevant time period, MLMI "was not an operating company. It was a special purpose vehicle or entity that was utilized [to issue securities]." SUF ¶ 8. MLMI had no employees, and all but one of its officers and directors were employees of MLPFS. SUF ¶¶ 9, 11. MLMI's books and records were maintained by MLPFS, and MLMI had no capital apart from funds that were provided by Merrill Lynch & Co., Inc., the parent company.[9] SUF ¶ 12. MLMI had no office space or computer systems separate from MLPFS. SUF ¶ 14. All relevant policies and procedures governing the residential mortgage-backed securitization business at Merrill Lynch, including those governing MLMI, were policies and procedures of MLPFS because it "was the main operating unit and where the employees were housed." SUF ¶ 16. MLPFS employees selected the loans MLML would purchase for MLMI to securitize in the WLTD Securitizations. SUF ¶ 10.[10] WLTD traders (MLPFS employees) similarly controlled the quantity and quality of diligence conducted by the WLTD diligence teams.[11] MLPFS thus entirely directed MLMI in issuing the WLTD Securitizations.

## B.   MLPFS Conducted No Diligence When Securitizing WLTD Loans

The WLTD's business was to acquire pools of mortgage loans from originators and other sellers—or, in the WLTD's parlance, their "clients" (SUF ¶ 83)—to have MLMI securitize them, and then to sell the securities backed by the purchased loans to investors such as the GSEs. SUF ¶ 82. Before the WLTD paid for a pool of loans, Ms. Alexander's or Mr. Amoroso's group, at

---

[9]   Both MLMI and MLPFS were wholly owned (either directly or indirectly) by Merrill Lynch & Co. SUF ¶¶ 2, 4.

[10]   Although MLPFS employees decided which loans would be acquired, the acquiring entity was defendant MLML, which was wholly owned by defendant MLMC, which in turn was indirectly wholly owned by Merrill Lynch & Co. SUF ¶ 2. Like MLMI, MLML was not an operating company, and its sole business was the acquisition of loans. SUF ¶ 3. All of MLML's officers and directors were MLPFS employees. SUF ¶ 11.

[11]   As discussed in detail in Part I.E.2, *infra*, WLTD traders routinely overruled the conclusions reached by the subordinate WLTD diligence groups.

the direction of the WLTD traders, would conduct diligence on the acquisition pools, including credit, compliance, and valuation reviews.  SUF ¶ 84.  After settlement, the WLTD would hold the acquired pools on MLPFS's books until the loans were securitized.  SUF ¶ 85.  For at least 30 of the WLTD Securitizations, MLPFS combined loans from multiple acquisition pools to create the SLGs backing the GSE Certificates.  SUF ¶ 86; Declaration of Charles Cipione In Support Of Plaintiff's Motion For Partial Summary Judgment ("Cipione Decl.") ¶ 10.[12]

The average time from acquisition to securitization for subprime loans was two to four months.  SUF ¶¶ 87-88.  Merrill Lynch, however, often held loans on its books for significantly longer periods.  For example, Merrill Lynch purchased a pool of loans labeled "2006-15P1" on March 29, 2006 (SUF ¶ 167), but it did not securitize at least 69 of these loans until April 2, 2007, when it included them in the MLMI 2007-HE2 Securitization.  Cipione Decl. ¶ 24.  While Merrill Lynch held the mortgage loans, it received income from them.  SUF ¶ 89.

Despite months lapsing between acquisition and securitization, MLPFS conducted no additional diligence after the WLTD acquired the acquisition pools—including when creating the SLGs or preparing the offering materials.  SUF ¶¶ 90-92.  Mr. Whalen, the head of MLPFS's residential mortgage-backed securitization group,[13] testified that Ms. Alexander's and Mr. Amoroso's teams completed their diligence processes "prior to acquisition of a whole loan," and not "in connection with the particular collateral pool that was going to collateralize any specific securitization."  SUF ¶ 91.  Mr. Whalen explained that MLPFS believed acquisition-level diligence provided "what was necessary to be able to do the securitization," and that "there was no need" for Merrill Lynch to conduct credit, compliance, or valuation diligence at the time of securitization, because "it had already been done" at the time of acquisition.  SUF ¶ 92.

---

[12]  *See* Little Report Exs. 6C and 6D (showing acquisition pools that were combined to create the Securitizations).
[13]  Mr. Whalen earned a base salary of ███████ in 2005 and ███████ in 2006, while earning a bonus of ███████ in 2005 and ███████ in 2006.  SUF ¶ 35.

Merrill Lynch's diligence personnel recognized that post-acquisition diligence of the loans on Merrill Lynch's books would have revealed potential misrepresentations by borrowers that would have been more difficult to detect when the WLTD purchased those loans.  Shannon Madden, who was in charge of SURF's post-acquisition quality control efforts (SUF ¶ 43), testified that certain types of borrower misrepresentations are easier to detect post-acquisition based on "information that's available after the fact that's not available to you during the due diligence process," such as "new credit report[s and] review appraisals."  SUF ¶ 187.  For example, "an undisclosed mortgage [is] easier to uncover because of the passage of time in the QC process than it would be up front in the acquisition process," because, as Ms. Madden testified, "it takes several months for a mortgage to show up on a credit report."  SUF ¶ 188.  As another example, Ms. Madden testified that her quality control team found loans misrepresenting that the borrower would occupy the property, but uncovering the misrepresentation required "compar[ing] the intent of the borrower at the time of closing to what actually happened after closing through . . . whatever documentation was available to us post-closing."  SUF ¶ 189.

In fact, fraud reports maintained by one of Merrill Lynch's wholly-owned loan servicers, Wilshire Credit Corporation ("Wilshire") (SUF ¶ 2), confirm that if MLPFS had conducted post-acquisition diligence, it would have uncovered evidence of fraud in the loans prior to securitization.  For example, Loan No. 121287842 was originated on December 9, 2006 and was securitized into the SURF 2007-BC2 Securitization on April 24, 2007.  Cipione Decl. ¶ 20.  Wilshire learned of fraudulent activity relating to this loan as early as March 8, 2007, more than a month *before* the loan was securitized.  Cipione Decl. ¶ 20.  Wilshire often learned of fraudulent activity relating to loans months after they were originated, such as that "[b]orrower claims Granddaughter coerced her into signing her loan documents."  Cipione Decl. ¶ 19.

11

Despite knowing that post-acquisition information might reveal material information about borrowers' representations, the WLTD's diligence teams made no effort to review any specific information that became available in the months prior to securitization.  SUF ¶¶ 90-92.

### C.   MLPFS's Diligence Teams Did Not Verify The Representations In The WLTD Securitizations' Prospectus Supplements

MLPFS believed its only legal responsibility for the securitizations it underwrote was to repurchase securitized loans that suffered early payment defaults ("EPDs") or first payment defaults ("FPDs"), an eventuality for which it maintained reserves.  SUF ¶ 93.  Otherwise, MLPFS believed it had no "legal or client relationship obligations" for the "poorly performing securitizations" that it underwrote.  SUF ¶ 93.  Consistent with this belief, there is no evidence that the WLTD diligence teams took steps to ensure the accuracy of the representations in the Prospectus Supplements.  When asked the purpose of the diligence that her team conducted, Ms. Alexander testified that "I think it was my job to protect Merrill Lynch and in turn that would have protected whoever purchased the loans from Merrill Lynch."  SUF ¶ 173.  Similarly, Walter Podlasek, a member of Ms. Alexander's team (SUF ¶ 21), testified that the purpose of his diligence review was "[t]o protect Merrill's interest" by "mak[ing] sure that the loans being reviewed were properly originated, properly documented, that the values were properly supported, and if not, to not purchase those loans."  SUF ¶ 174.

Accordingly, there is no evidence that the WLTD diligence teams conducted any diligence on the mortgage loans acquired by the WLTD to verify the accuracy of representations about those loans in the Prospectus Supplements.  When asked if anyone under his supervision was "responsible for verifying or reviewing the accuracy of the information contained in the prospectus supplements that were being issued in connection with the securitizations that Merrill Lynch was underwriting," Mr. Mora, who oversaw both Ms. Alexander's group and Mr.

Amoroso's group, answered with an unqualified "[n]o."  SUF ¶ 168.  There is no evidence that anyone presented the WLTD's diligence teams with any offering materials or asked them to verify the accuracy of the representations contained in such materials.  To the contrary, Ms. Alexander, the head of subprime due diligence, testified that, to her knowledge, no one in her group was involved "in any way, in any shape or form" in performing diligence of the offering materials or in connection with issuance of securitizations.  SUF ¶ 169.  By way of example, Mr. Podlasek testified that he never reviewed a prospectus supplement for a mortgage-backed security, was not aware of what representations it might contain, and did not conduct any diligence to verify any such representations.  SUF ¶ 170-72.[14]

Further, there is no evidence that Merrill Lynch ever established a formal set of diligence procedures for the WLTD.  While Merrill Lynch's "Front Office Control Manuals" provided a short, high-level description of the diligence that MLPFS conducted on mortgage loans (SUF ¶¶ 45-47), MLPFS had no formal written policies or procedures governing how diligence should be performed on the loans the WLTD acquired (SUF ¶ 48).[15]  There is likewise no evidence that Merrill Lynch changed or modified any processes or procedures that had been in place between 2005 and 2007, despite becoming aware, as early as the first quarter of 2006, of a rise in delinquencies in the loans the WLTD acquired.  SUF ¶ 219.  Nor did MLPFS provide its employees with any formal training on conducting diligence on such loans.  SUF ¶ 53.

---

[14]  While Merrill Lynch performed a data integrity review, that review did not confirm the accuracy of statements in the loan files or Prospectus Supplements, but rather "scrub[bed] the loan tape" by "look[ing] at the database, look[ing] at the runs … [run] logic checks, look[ing] for … mistyped or data that may not make sense[.]"  SUF ¶ 80.
[15]  The Front Office Control Manual for the Non-Prime desk contained one short section on "Underwriting Due Diligence," providing no actual policies or procedures for the WLTD's diligence teams to follow.  While the Manual called for a "statistical sample" and "adverse sample," it provided no guidance, policies or procedures detailing how such samples should be selected.  SUF ¶ 46.

**D.  MLPFS Conducted No Diligence—Either Through A Direct Review Or Statistically Representative Sampling—For The Vast Majority Of Loans In The SLGs**

MLPFS did not review each loan it acquired.  MLPFS examined only samples of the acquisition pools, and did not use any scientific method or discernible criteria to select the loans to review.  Rather, the WLTD selected loans based on the subjective impressions of its diligence personnel.  MLPFS could not extrapolate the results of this sporadic and jumbled review to the loans in the acquisition pool, much less to the loans pulled from the acquisition pools months later to form the SLGs for each Securitization.

**1.  MLPFS Conducted Diligence On Samples Of Acquisition Loan Pools, Not Of Loans Selected For Securitization**

Although Ms. Alexander, the head of subprime due diligence, would have preferred to review 100 percent of the loans in each pool acquired by the WLTD (SUF ¶ 107), her group and Mr. Amoroso's group did not review all of the loans in the WLTD's acquisition pools, except in very rare instances.[16]  SUF ¶¶ 103-04.  Instead, their groups performed diligence on only a "sample" of each loan pool at the time of acquisition.  SUF ¶ 102.  The WLTD traders generally determined the size of the sample for each acquisition pool.  SUF ¶ 106.  The WLTD did not conduct any credit or compliance diligence on any of the loans in the acquisition pools that were not part of these samples.  SUF ¶ 103.  After the WLTD acquired the loan pools, no additional samples were drawn or diligence conducted in connection with the final pool of loans that MLPFS selected, often from a variety of acquisition pools, for securitization.  SUF ¶¶ 91, 105.

---

[16]  Ms. Alexander testified that, in the rare instances when the WLTD purchased very small pools of loans, or in evaluating a new originator, her team might perform diligence on the entire acquisition loan pool.  SUF ¶ 104; *see also* Little Report Ex. 6C-D (showing a mere 16 out of 179 acquisition pools with 100 percent due diligence).

2.    MLPFS's Sample Sizes Were Not Scientifically Determined And Were
Often Lowered To Accommodate Originators

For acquisition pools, the WLTD typically conducted credit and compliance diligence on samples of between 20 percent and 25 percent of the acquisition pool.  SUF ¶ 108.  Merrill Lynch cannot present any evidence to demonstrate that these sample sizes were determined scientifically or that the samples were statistically representative, such that the results could be extrapolated to the entire pool.  SUF ¶ 134; *see* Little Report ¶ 58 ("The [sample] selection process was not designed to achieve any specific level of statistical significance.").  In fact, a March 2007 internal audit of the prime and Alt-A trading desk concluded: "[t]he sampling methodology supporting the amount of loans sampled during pre-settlement due diligence has not been documented."  SUF ¶ 115.

The WLTD traders would often choose lower sample sizes for reasons wholly unrelated to the characteristics of the entire acquisition pool.  WLTD traders often capped the sample sizes through trade stipulations between the WLTD and originators.  SUF ¶ 111.  In one email, Richard Florin, who worked for Mr. Amoroso's diligence team, attempted to increase a stipulated 15 percent sample size to 25 percent.  SUF ¶ 114.  When the originator (or "client," as viewed by the WLTD) complained, however, the WLTD reduced the sample size back down to 15 percent.  SUF ¶ 114.  Furthermore, as discussed in Part I.F, *infra*, the WLTD further reduced the sample size for those originators in which Merrill Lynch had an ownership interest.

3.    MLPFS Did Not Select Samples That Were Representative Or That
Included All Loans That Met The Adverse Criteria

Once a WLTD trader set a sample size, the WLTD's diligence employees would choose the loans within the sample, selecting one portion "randomly" and another portion "adversely." SUF ¶ 127.  Ms. Alexander used a random number generator in Microsoft Excel to identify random loans to include in the sample.  SUF ¶ 128.  But Mr. Podlasek, who worked for Ms.

15

Alexander, would "sort the loans by sample field" in a spreadsheet and then "pick every tenth loan, every twentieth loan, depending on how many random loans we needed to choose."  SUF ¶ 129.  There is no evidence that the WLTD employees consistently used a statistically valid methodology to randomly select loans; further, there is no evidence that, even for random selections, any checks were performed as to whether the loans in the sample were representative of the population.  SUF ¶ 134.

The WLTD's diligence personnel also selected the "adverse" portion of a sample by focusing on credit characteristics that appeared to fall outside, or at the boundaries of, an originator's underwriting guidelines.  SUF ¶ 130.  The WLTD diligence employees used no systematic process, method, or criteria to ensure that all "adverse" loans were reviewed.  SUF ¶ 133.  Rather, the WLTD's diligence personnel had an *ad hoc* approach to selecting only as many "adverse" loans as the sample size permitted.  By way of example, Mr. Podlasek would "run summary reports first to determine the range of LTVs, property type breakdowns, various qualities of the loans" and then "based on that, that's how I would go into the tape, sort, and then select" the adverse loans that would be included in the sample.  SUF ¶ 131.  Ms. Alexander viewed selecting adverse loans as "an art not a science."  SUF ¶ 132.

4.  MLPFS Did Not Extrapolate Its Diligence Results To The SLGs As A Whole

The WLTD's diligence personnel admitted that they made no attempt to extrapolate their findings from their review of a sample of loans to determine the characteristics of the rest of the acquisition pool.  SUF ¶¶ 134-35.  Mr. Mora, the head of the WLTD, explained, that there was no need for the WLTD to extrapolate their findings to the entire loan pools because the WLTD was "supposed to rely on" the representations and warranties of the third-party originators.  SUF ¶ 136.  Nor is there any evidence that the WLTD contemplated changing its "randomization"

procedures to obtain statistically valid random samples to extrapolate the results to loans in the acquisition pool.

5.    MLPFS Conducted No Diligence Beyond Its Acquisition Pool Samples

Other than selecting a sample of loans from the acquisition pools to review, neither Ms. Alexander's group nor Mr. Amoroso's group performed any diligence on the loans in the SLGs.  SUF ¶ 137.  In fact, Merrill Lynch has produced no evidence showing that it knew which loans within the SLGs had been subject to acquisition-stage diligence.  Nor is there any evidence that Merrill Lynch possessed sufficient knowledge of the quality of the loans in the SLGs from its *ad hoc* acquisition-stage analysis, since it did not produce statistically representative diligence results that could be extrapolated to the full SLGs.  SUF ¶¶ 134-35.[17]  MLPFS could not have done so because the SLGs were populated with loans drawn from multiple acquisition pools for which the originators, sample sizes, loan selection, and types of diligence conducted varied. SUF ¶ 86.

Consequently, there was extreme variation in the percentages of loans in the SLGs at issue that had been subject to diligence during the acquisition stage.  According to data produced by Merrill Lynch's proffered expert, while diligence was conducted on an average of 20.5 percent of the loan groups in each of the SLGs backing the WLTD Securitizations, in many cases the diligence was far less, with MLPFS reviewing none of the loans in the FFMER 2007-H1 Securitization, and less than 4 percent of the loans in the FFMER 2007-5 Securitization.[18]  There

---

[17]   Merrill Lynch's proffered expert does not set forth any evidence showing the loans analyzed during the acquisition stage were representative of the SLG loans; rather, Mr. Little merely provides evidence of the acquisition pool diligence sample sizes.  *See* Little Report Exs. 6A-D.

[18]   Attached as Exhibit 1 to the Cipione Declaration is a chart showing the number of loans backing each SLG at issue on which the WLTD conducted acquisition-stage credit diligence, according to data produced by Merrill Lynch's proffered expert.  As noted, MLPFS often put loans from one acquisition pool into multiple Securitizations. In its data, Merrill Lynch counted any *one* loan it had diligenced in such an acquisition pool as being a diligenced loan for purposes of *all* the multiple Securitizations drawn from that pool.  By way of example, Loan No. 4718807 was included as a diligenced loan for three different Securitizations (MLMI 2007-HE2, OWNIT 2006-4, and

is no evidence that the percentage of diligenced loans that ended up in a SLG was a result of anything other than happenstance.

### E.   The WLTD Retained Third-Party Vendors To Perform Loan Level Diligence But Failed To Provide Them With Adequate Instructions And Guidance, And Routinely Securitized Loans That The Vendors Identified As Defective

After drawing a sample from an acquisition pool, Ms. Alexander's and Mr. Amoroso's teams retained third-party diligence firms—primarily Clayton Holdings Inc. ("Clayton") and the Bohan Group ("Bohan")—to conduct credit and compliance diligence on the mortgage loans.[19] SUF ¶¶ 138-39.  After reviewing a loan from the sample, these firms would grade it as "EV1," "EV2" or "EV3."  SUF ¶ 143.  A grade of EV1 indicated that the loan complied with the originator's guidelines and that Merrill Lynch could purchase the loan.  SUF ¶ 144.  A grade of EV2 indicated that the loan did not comply with the originator's guidelines but had sufficient compensating factors to offset the increased credit risk associated with the exception from guidelines such that Merrill Lynch could purchase the loan.  SUF ¶ 145.  A grade of EV3 indicated that Merrill Lynch should not purchase the loan, either because the loan did not comply with the originator's guidelines and lacked sufficient compensating factors, or it posed a regulatory compliance issue.  SUF ¶¶ 146-47.

---

OWNIT 2006-5).  Cipione Decl. ¶ 10.  While FHFA reserves its rights to challenge Merrill Lynch's data should trial be necessary, for Rule 56 purposes, FHFA presents this data as presented by Merrill Lynch's proffered expert.

[19]   The WLTD also used a number of third-party vendors, including Clear Capital and Hansen Quality, to conduct valuation diligence.  SUF ¶ 140.  Merrill Lynch also hired Deloitte & Touche LLP ("Deloitte") to conduct a limited review of the information presented in the Prospectus Supplements by:  (1) comparing data in the loan tapes to the collateral tables in the Prospectus Supplements; and (2) for a very small number of loans, comparing certain loan tape data to certain documents in loan files provided by Merrill Lynch.  SUF ¶¶ 141-42.  Deloitte did not do anything to verify the accuracy of the information in the loan files, loan tapes, or the disclosures in the Prospectus Supplements.  *Id.*  As Mr. Florin stated, "I don't consider Deloitte results as due diligence."  SUF ¶ 81.

1.   <u>The WLTD's Diligence Teams Had Serious Concerns About The Competence Of Their Third-Party Diligence Vendors And The Quality Of Their Work</u>

WLTD's diligence personnel had serious concerns about the ability of its third-party diligence vendors to properly review and accurately grade loans.  SUF ¶ 148.  Ms. Alexander testified that she had a "frustrated view" of both Clayton and Bohan because they were making "serious mistakes" and "they were missing things, that there might have been a misunderstanding of underwriting guidelines."  SUF ¶¶ 149-50.  Ms. Alexander wrote in one email that she was "very scared" of Bohan's incompetence.  SUF ¶ 153.  Ms. Alexander got so frustrated with Clayton and Bohan that she put them both in the "penalty box" (SUF ¶ 151), which meant Ms. Alexander would not allow them to work on any acquisition deals for a month "or they got a considerably less number of … deals a month" (SUF ¶ 152).  She recalled putting both Clayton and Bohan in the penalty box between 2004 and 2007 (SUF ¶ 151), but explained that, in doing so, she "was restricted by the fact that we still needed to get deals done" (SUF ¶ 152).  Mr. Podlasek had his own set of concerns with Bohan, stating "I don't think they have done anything right since we started back using them."  SUF ¶ 154.  Mr. Mora was equally troubled by the third-party diligence firms, stating in one email that they "are only as good as the direction we give them and the lead the[y] assign to us for a trade."  SUF ¶ 155.

2.   <u>The WLTD Diligence Teams And WLTD Traders Would Often "Overturn" Vendors' Recommendations Not To Buy Loans</u>

MLPFS designed its review third-party diligence firms' results so as to securitize as many loans as possible.  SUF ¶¶ 157, 159.  Notwithstanding the WLTD diligence personnel's concerns about the competency of their third-party vendors, there is no evidence that WLTD's diligence personnel reviewed any files for any loan that their vendors graded as EV1 or EV2.  Nor is there any evidence that the WLTD undertook any effort to ensure that the vendors were

19

appropriately grading those loans as suitable for purchase.  Rather, Ms. Alexander and Mr. Amoroso's teams deferred to the third-party vendors' grading of the loan as compliant with underwriting guidelines, and limited their review of loans graded EV1 and EV2 to a cursory examination of the loan-grade summary sheets provided by the diligence firms.  SUF ¶ 156. MLPFS securitized such loans without any additional checks or quality-control reviews.

In contrast, Ms. Alexander and Mr. Amoroso's teams would conduct loan file reviews on "the widest swath" of loans graded as EV3s.  SUF ¶ 157.  Their purpose was to look for ways to reclassify such loans as EV2s—or "overturn" them, in Merrill Lynch's parlance—based on compensating factors and other exceptions to the underwriting guidelines so that the WLTD could buy them and MLPFS could securitize them.  SUF ¶ 159-60.[20]  As one WLTD diligence employee wrote, he reviewed "all the loans that were designated by the Due Diligence company as EV3 and have overturned as many loans as possible."  SUF ¶ 159.  Mr. Amoroso, the head of prime and Alt-A due diligence, reviewed "each loan to make sure that [he] believed what they graded an EV-3 was truly an EV-3."  SUF ¶ 161.  In one instance, Ms. Alexander wrote that the WLTD diligence group reviewed 193 EV3 loans three times each (twice by Ms. Alexander herself).  After a call with the originator, her "client," Ms. Alexander agreed to have Clayton "go through the files one more time" in an effort to overturn more EV3s.  SUF ¶ 160.

There is no evidence that, in conducting these reviews of EV3 graded loans, the WLTD's diligence personnel used written policies or procedures to ensure that any newly-identified compensating factors were documented in the loan files, and that the additional credit risk associated with the EV3 loans were sufficiently offset by such compensating factors.  Nor is there any evidence that, in light of the EV3 loans identified by the third-party vendors, the

---

[20]  When Ms. Alexander reclassified loans, she often graded them as "EV5s" or "EV2Ws" to track those loans that she overturned.  SUF ¶ 158.

WLTD ever conducted additional diligence on the loans outside of its samples, even though the WLTD's diligence personnel were empowered to expand the samples whenever the diligence results revealed a material divergence from applicable underwriting guidelines or predatory lending laws.  SUF ¶¶ 46-47.  Although Ms. Alexander testified that she would increase the sample size if there were "systemic issue[s] that we were finding with the loan files" (SUF ¶ 112), Mr. Mora, the head of the WLTD, testified that Ms. Alexander would have had to seek his approval to increase the sample size, and he recalled the WLTD diligence team actually increasing the original sample size on only one occasion for a "very small pool" (SUF ¶ 113).  In fact, there is no evidence that Merrill Lynch ever increased its sample for any acquisition pools whose loans were securitized into the WLTD Securitizations.

Even if the WLTD's diligence personnel decided that a loan should be graded as an EV3, the WLTD traders could overrule that decision, as the traders had the final say on whether loans would be removed from an acquisition pool.  SUF ¶¶ 162-63.  In one email, Mr. Amoroso's subordinate sent a list of loans to a trader, identifying loans he recommended rejecting but also saying: "[l]et me know how many of these you want to override my decision on."  SUF ¶ 164.  Mr. Podlasek, who focused on valuation diligence, testified about one instance where "[t]here were about seven loans that were rejected for valuation and the trader overruled and included them in the funding." SUF ¶ 165.  In another email, Mr. Podlasek sought confirmation from a WLTD trader that a larger group of loans should be included in a pool, despite being ***ineligible*** for purchase due to issues uncovered during valuation diligence; Merrill Lynch included the loans in the pool.  SUF ¶ 166.  Mr. Podlasek also wrote his supervisor, Ms. Alexander, regarding the "2006-15p1" pool of loans—some of which Merrill Lynch held on its books for over a year before securitizing them in the MLMI 2007-HE2 Securitization (*see* Part I.B, *supra*)—

21

questioning whether anything the diligence teams did affected the loans that were being securitized: "[h]ow much time do you want me to spend looking at these if Vince [Mora] is going to keep them regardless of issues? ... Makes you wonder why we have due diligence performed other than making sure the loan closed." SUF ¶ 167.

As a result of these practices, large numbers of loans graded as EV3s by Clayton, Bohan, and/or the WLTD's diligence teams found their way into the Securitizations. For example, a review of loans graded as EV3s in acquisition pools corresponding to the loans in the FFMER 2007-1 Securitization shows 76 loans graded as EV3s that were included in the Securitization. Cipione Decl. ¶ 16.

### F.    The WLTD Traders Directed The WLTD Diligence Team To Conduct Only Minimal Diligence On First Franklin And Ownit Loans After 2006

Merrill Lynch's diligence process for loans originated by the two originators in which it had an ownership interest changed dramatically post-acquisition. Merrill Lynch acquired First Franklin on December 30, 2006 (SUF ¶ 175), and a 20 percent stake in Ownit Mortgage Solutions, Inc. ("Ownit") in September 2005 (SUF ¶ 116).

*First*, Merrill Lynch allowed First Franklin to override the recommendations of the WLTD's diligence managers. SUF ¶ 176. For instance, even though Ranae Lacey, the overall head of diligence for the Merrill Lynch mortgage program as of late 2006, recommended that MLPFS not acquire loans in First Franklin acquisition pools, First Franklin overrode her opinion by seeking approval from Mr. Whalen to securitize the loans.[21] SUF ¶ 177. Mr. Whalen assured First Franklin that "Ranae is providing her opinion, but [it is] your program. I will remind Ranae and team of this but have had prior conversation[s] on this. If you are comfortable that these

---

[21]   In late 2006, Ms. Lacey transitioned from heading up diligence for SURF to heading up diligence for the entire Merrill Lynch mortgage platform, with Ms. Alexander reporting in to her. SUF ¶ 44.

loans are normal/acceptable quality it is your call …. Pl[ease] coordinate with Jason to make sure all loans get into FFMER3." SUF ¶ 177.

*Second*, Merrill Lynch significantly reduced the amount of diligence it conducted on loans originated by First Franklin and Ownit.[22]  Four days prior to Merrill Lynch's acquisition of First Franklin, Ms. Alexander wrote:  the WLTD's "DD strategy [for First Franklin] will be different as we will now own them.  I understand we are doing minimal review–including valuation[.]" SUF ¶ 179.  In February 2007, Mr. Podlasek cancelled an order with a third party vendor to conduct valuation diligence on a First Franklin pool, writing that "[i]t is confirmed that we no longer need to do any valuation diligence on the First Franklin pools." SUF ¶ 180.  Mr. Whalen testified that, in his view, "the front-end processes" at First Franklin made "diligence a wasted cost." SUF ¶ 178.  In March 2007, Mr. Whalen reiterated the lack of diligence for First Franklin:  "everyone should be reminded that if we securitize the loans [they] will go directly into the securitization without the equivalent of a whole loan due diligence.  This process is identical to other issuers who directly securitize.  As a result, valuation and other credit kickouts will not occur." SUF ¶ 181.

For Ownit, the WLTD further narrowed its diligence as part of its ongoing effort to "reduc[e] [its] diligence expenses."[23]  SUF ¶ 118.  Mr. Mora told Ms. Alexander that the two of them "need[ed] to discuss [the] appropriateness/possibility of narrowing diligence to [the] minimum required to meet securitization needs" for loans acquired from Ownit.  SUF ¶ 117.  Ms. Alexander later confirmed that "[i]t is my understanding that we agreed to reduce our due

---

[22]   First Franklin originated loans backing ten WLTD Securitizations: The FFMER 2007-1, FFMER 2007-2, FFMER 2007-3, FFMER 2007-4, FFMER 2007-5, FFMER 2007-H1, FFML 2005-FF12, FFML 2006-FF18, FFML 2007-FF1, and FFML 2007-FF2 Securitizations.

[23]   Ownit originated loans backing nine WLTD Securitizations: The OWNIT 2005-4, OWNIT 2005-5, OWNIT 2006-1, OWNIT 2006-2, OWNIT 2006-3, OWNIT 2006-4, OWNIT 2006-5, OWNIT 2006-6 and OWNIT 2006-7 Securitizations.

diligence [for Ownit] to a 10 percent level in return for 3 months EPD."[24]  SUF ¶ 119.  Merrill

Lynch also moved to post-closing due diligence for certain Ownit securities.[25]  SUF ¶ 121.

*Third*, Merrill Lynch securitized loans from these originators that it had previously

identified as defective.  For First Franklin, the WLTD securitized loans it had rejected before

Merrill Lynch acquired First Franklin.  SUF ¶ 183.  Thus, although there is some evidence that a

third-party diligence firm performed *pro forma* reviews of First Franklin loans (SUF ¶ 182),

documents produced by Merrill Lynch confirm that the results of those reviews were ignored,

consistent with Mr. Whalen's instructions that the diligence team's results were only

"opinion[s]."  SUF ¶ 177.  In FFMER 2007-1, for example, records reflect that MLPFS

securitized 76 loans that received an EV3 grade from the diligence vendor.  Cipione Decl. ¶ 16.

Similarly, for Ownit, a September 2006 presentation listed Merrill Lynch as a "friend"

rather than a "foe" because the "Merrill Lynch kick-out rate is lower than those of any other

significant investor" with Ownit.  SUF ¶ 120.  Moreover, in response to the results from a quality

control audit conducted by Ms. Madden following the implementation of post-closing due

diligence, Ms. Alexander recognized loans were being securitized that otherwise should not have

been, stating: "I want to be sure that all know many of these loans would not have been

purchased if we had the opportunity to perform due diligence prior to funding."  SUF ¶ 123.

*Finally*, Merrill Lynch executives recognized, albeit late in the relevant time period, that

the inadequate diligence resulted in increased vulnerability to bad loans and borrower

---

[24]  *See also* Little Expert Report ¶ 108 (Merrill Lynch sometimes used a sample size of 10 percent following its acquisition of a 20 percent interest in Ownit); Ex. 6C (showing sample size of 10 percent for most Ownit securitizations issued in 2006 and 2007) .

[25]  In post-closing diligence, the WLTD diligence teams performed its diligence after the mortgage loans were purchased from originators.  SUF ¶ 122.  The WLTD did not have the ability to reject or "kick out" loans as part of this diligence process, and instead was limited to submitting repurchase requests to the originators for defective loans post-acquisition.  *Id.*  The originators had the ultimate authority for determining whether to agree to repurchase such defective loans.  *Id.*  If the originators refused to repurchase such loans, the loans would remain with Merrill Lynch unless they could be sold or securitized.

misrepresentations.  Scott Soltas, to whom Mr. Mora began reporting in 2007, stated in March

2007 that there was "too much trader input" at First Franklin that "leaves us vulnerable to liars

and bad people," concluding that "they need limits that can actually constrain them."  SUF ¶ 184.

Mr. Soltas explained that, "[g]oing forward" from March 30, 2007, "we need rigor in our due

di[]ligence process."  SUF ¶ 184.

> ### G.   MLPFS Was Concerned About The Staffing Level Of The WLTD's Subprime Diligence Group Yet Did Not Hire Any Additional Personnel

The volume of loans purchased by the WLTD increased substantially from 2005 to 2007.

SUF ¶ 20.  During that time, Ms. Alexander's diligence team consisted of, at most, three people:

Ms. Alexander, Mr. Podlasek, and either Jeff Hartnagel or Alison Malkin.[26]  SUF ¶ 21.

Ms. Alexander's team was responsible for conducting diligence on as many as seven acquisition

deals per month, and each deal manager could be responsible for the diligence conducted on as

many as four deals per month.  SUF ¶ 28.

Throughout the relevant time period, the WLTD knew that such rates were unsustainable.

In a June 2006 email, Ms. Alexander wrote:  "we simply do not have the staff to send someone

out to tie out deals.  We are closing 11 deals between 2 people this month (14 actually but three

will have already closed before the last 3 days of the month)."  SUF ¶ 29.  In Ms. Alexander's

2005 performance review, Mr. Mora commented that "Diane will need to think about staffing

levels and continue to evaluate our process to make sure they're optimal for us going forward."

SUF ¶ 30.  Ms. Alexander also expressed concerns about the level of staffing with diligence

responsibilities in 2006 and 2007.  SUF ¶ 31.  Despite conversations with Mr. Mora about

increasing staff levels, and despite concerns about the quality of the third-party diligence vendors

---

[26]   Mr. Hartnagel replaced Ms. Malkin in mid-2006 after some period of time during which neither was on the team.
SUF ¶ 33.

that her team was supervising, Ms. Alexander did not hire any additional personnel, with the exception of replacing Ms. Malkin with Mr. Hartnagel.  SUF ¶¶ 32-33.

## II.    MLPFS'S DILIGENCE ON THIRD-PARTY SECURITIZATIONS

In the Third-Party Securitizations, MLPFS did not acquire the loans or determine which loans to include in the securitizations.  Instead, MLPFS's role was to underwrite the securitization and conduct diligence on the loans considered for inclusion in the securitization (*see* SUF ¶ 95-96).  That diligence process, which the WLTD also conducted (SUF ¶ 138), was inadequate for many of the reasons set forth in Part I, *supra*: (1) there were no formal policies or procedures outlining how the diligence should be conducted; (2) the traders had the ability to override the diligence managers; (3) there is no evidence that the credit, compliance, or valuation diligence was tied to verifying the accuracy of the representations contained in the Prospectus Supplements; (4) the random portion of the loans sampled for diligence was not selected using statistically valid methods and all loans that met the adverse selection criteria were not included in the adversely selected portion of the sample; (5) the diligence managers used the same third-party diligence vendors despite concerns about their competence and the quality of their work; (6) the diligence personnel and traders sought to "overturn" the vendor's grades of EV3; and (7) there was inadequate staffing of diligence personnel.

There are three relevant differences between the diligence that MLPFS performed for Third-Party Securitizations and the diligence it performed for the WLTD Securitizations.  *First*, Ms. Alexander's and Mr. Amoroso's teams performed their diligence for the Third-Party Securitizations at the time of securitization.  SUF ¶ 96.  *Second*, the loans in the Third-Party Securitizations were not selected by the WLTD traders, but by the third-parties who hired MLPFS to underwrite the securitization.  SUF ¶ 95.  *Third*, despite having less information about the loans in the Third-Party Securitizations, MLPFS performed **less** diligence for Third-Party

26

Securitizations than it did for the WLTD Securitizations. While sample sizes for subprime WLTD Securitizations were 20 percent to 25 percent (SUF ¶ 108), MLPFS typically selected sample sizes of 10 percent or less for Third-Party Securitizations (SUF ¶ 124).[27] There is no evidence explaining why MLPFS thought such a lower size was appropriate. For certain Third-Party Securitizations, little to no credit or compliance diligence was conducted. SUF ¶ 124-25. According to data produced by Merrill Lynch's proffered expert, for the six Third-Party Securitizations issued by sponsors other than IndyMac, MLPFS performed credit and compliance diligence on: (1) no loans in the SLG for one Securitization;[28] (2) between 1 percent and 7 percent of the loans in the SLGs for four Securitizations; and (3) less than 13 percent of the loans in the SLG for the last Securitization.[29]

For the Third-Party Securitizations issued by IndyMac, the WLTD conducted even less diligence. According to Mr. Whalen, "IndyMac typically did not mandate people to do their Alt-A deals, but rather, they sold AAA bonds." SUF ¶ 98. Mr. Whalen testified that the WLTD generally did not perform any credit diligence on bonds that were rated AAA, limiting diligence to subordinate bonds. SUF ¶ 101. He testified that he could not recall a situation where MLPFS was "mandated by IndyMac for an underwriting for a fee." SUF ¶ 99. Instead, MLPFS would buy the bonds and "ultimately turn around and sell them out to the market." SUF ¶ 100. With respect to diligence on such deals, he testified that "[o]ur group wouldn't do it, but we would get the results from groups that would." SUF ¶ 101. There is no evidence that MLPFS ever inquired into the results they were provided, nor is there evidence that MLPFS viewed these

---

[27]  *See* Little Report ¶¶ 103-04 (average sample size for subprime and Alt-A third-party securitizations were 8.5 percent and 11.9 percent, respectively).

[28]  Merrill Lynch's proffered expert admits there is a lack of documentation regarding the diligence performed on this securitization (the OOMLT 2007-1 Securitization), and thus does not opine on the adequacy of the diligence for this transaction. Little Report ¶ 103 & nn.27, 51.

[29]  *See* Cipione Decl. Ex. 1.

results as reasonable.  Based on the data produced by Merrill Lynch's proffered expert, of the six Third-Party Securitizations issued by IndyMac, MLPFS performed diligence on:  (1) less than 5 percent of the loans in the SLGs for three Securitization; (2) between 7 and 9 percent of the loans in the SLGs for two Securitizations; and (3) less than 13 percent of the loans in the SLGs for the remaining Securitization.[30]

For all 12 Third-Party Securitizations, Merrill Lynch has produced no evidence showing (1) which loans in the SLGs, whether subject to diligence or not, would have been considered "adverse" under the standards used by the WLTD diligence teams; (2) whether the percentages of SLG loans reviewed were statistically representative or significant; or (3) whether MLPFS was aware of the actual percentages of loans in the SLGs that were subjected to diligence, or made any effort to apply the diligence results to the entire pool.

## III.     MLPFS'S DILIGENCE ON THE SURF SECURITIZATIONS

Merrill Lynch created the SURF program to grow its residential mortgage-backed securitization business by targeting smaller originators.  SUF ¶ 185.  SURF's business model was to acquire and aggregate many small loan pools that it combined to issue securitizations off of Merrill Lynch's SURF-branded shelf.  SUF ¶ 191.  As with the WLTD, there is no evidence that SURF's diligence group performed diligence to verify the representations in the Prospectus Supplements, or performed additional diligence after acquisition in connection with the specific securitizations.  SUF ¶ 190.

### A.     SURF's Diligence Process Was Not Targeted To Ensuring That Loans Adhered To SURF's Published Seller Guidelines

While SURF represented to the public that its securitizations contained loans originated consistent with SURF's published guidelines, the reality was far different.  Ranae Lacey, who

---

[30]  *See* Cipione Decl. Ex. 1.

oversaw SURF's diligence team (SUF ¶ 40), had a publicly-stated policy of purchasing only loans that complied with SURF's own proprietary underwriting guidelines rather than originators' guidelines.  SUF ¶ 192.  SURF published its guidelines as part of a comprehensive "Seller Guide" that originators had to sign and agree to comply with before they could sell loans to SURF.  SUF ¶ 193.  SURF witnesses testified that using SURF's proprietary underwriting guidelines was important because it provided bond investors with a sense of continuity and quality.  SUF ¶¶ 194.  Jamie Willeck, the creator of the SURF program, testified that SURF used its own underwriting guidelines to build a brand name and reputation by "provid[ing] a consistent message to investors who were buying the securities."  SUF ¶ 195.

Internal SURF presentations, however, provide that the purpose of the SURF model was to establish long-term relationships with loan sellers.  SUF ¶ 196.  In practice, if an originator's loans regularly failed to comply with SURF's published guidelines, SURF would privately enter into "negotiated criteria" with the originator and then acquire the non-compliant loans.  SUF ¶ 198.  "Negotiated criteria" referred to "guidelines, program parameters, that may be different from those listed in the seller guide" and "would typically pertain to product guidelines or perhaps soft underwriting nuances."  SUF ¶ 197.  For example, a SURF employee wrote of an originator that "[t]here is a very high percentage of exceptions we make on this pool which is why we are currently working on some negotiated criteria."  SUF ¶ 199.  SURF used these criteria to purchase loans from originators that did not comply with its public guidelines.

During the diligence process, SURF sent applicable negotiated criteria to Hanover Capital Partners ("Hanover"), SURF's third-party diligence firm.  SUF ¶ 200.  Hanover conducted diligence using an automated system to determine whether a loan "did or did not meet the negotiated criteria."  SUF ¶ 200.  Based on the grade assigned by Hanover, SURF could tell

29

if loans that met the negotiated criteria also met SURF's published guidelines.  SUF ¶ 201.

If Hanover determined that a loan met the "negotiated criteria" but did *not* meet SURF's

guidelines, SURF would still acquire and securitize it.  SUF ¶ 202.  SURF's Prospectus

Supplements, however, represented that "[a]ll of the Mortgage Loans were originated generally

in accordance with SURF's Underwriting Guidelines."  SUF ¶ 203.  There is no evidence that

Merrill Lynch ever publicly disclosed the existence of SURF's "negotiated criteria" program or

that it was acquiring loans that did not meet SURF's published guidelines.

As a result, large numbers of loans SURF acquired did not adhere to SURF's published

underwriting guidelines.  SUF ¶ 204.  For example, in one acquisition pool of 39 loans, 23 were

waived in by SURF employees even though they did not comply with SURF's published

guidelines—a nearly 60 percent exception rate.  SUF ¶ 205.  The same document shows a nearly

50 percent exception rate for another pool of 288 loans.  SUF ¶ 206.

SURF rarely rejected loans for failure to comply with its guidelines.  SURF presentations

state that SURF's overall pull-through rate—the percentage of a loan pool offered for sale that it

actually purchased after conducting diligence—was 90 percent.  SUF ¶ 207.  Originators would

cite SURF's high pull-through rates and large numbers of exceptions to argue that the WLTD

should also reduce the number of loans it rejected from acquisition loan pools.  Ms. Alexander

wrote to Mr. Mora that Accredited—an originator that sold loans to both the WLTD and

SURF—had "pointed out that the deal with SURF had just as many exceptions but the[y] worked

it [d]own to a 90% execution."  SUF ¶ 208.

### B.      SURF Did Not Have Confidence In Its Third-Party Vendor

SURF used the third-party vendor Hanover to conduct its credit and compliance diligence.[31]  SUF ¶ 209.  Just as the WLTD did not trust Bohan or Clayton, SURF did not have confidence in Hanover.  When another Merrill Lynch employee asked Ms. Lacey if she would recommend Hanover, Ms. Lacey declined to do so, stating that she did not "think they deserve extra work."  SUF ¶ 217.  Similarly, after Hanover helped conduct the audit of Ownit loans described in Part I.F, *supra*, Ms. Madden recalled that Ms. Lacey "was unhappy with just some of the service that Hanover provided in the audit."  SUF ¶ 218.  Yet SURF continued to use Hanover as its only third-party diligence firm.

### C.      SURF Often Overturned Its Vendor's Recommendations To Exclude Loans That Did Not Comply With SURF's Underwriting Guidelines

SURF retained Hanover to conduct credit and compliance diligence on 100 percent of the loans in pools purchased by SURF, and to code each loan with a "risk class level" that indicated, among other things, whether the loan complied with SURF's underwriting guidelines.  SUF ¶¶ 212-13.  Like the WLTD diligence personnel, SURF acquisition analysts made no effort to review loans that Hanover determined could remain in a pool.  SUF ¶ 214.  As Ms. Madden described it, "[t]he data characteristics were evaluated by analytics prior to final pricing, but no[,] the individual loan was not reviewed by [a SURF] acquisition analyst," and could be securitized.  SUF ¶ 214.  If Hanover coded a loan as non-compliant with SURF's guidelines and recommended it be excluded from a pool, SURF employees would conduct a further review of the loan.  In conducting this review, SURF applied what it called an "internal exceptions policy," which Ms. Lacey contrasted with the "published guidelines" in the Seller Guide.  SUF ¶ 215.  If

---

[31]   The SURF group looked at Clayton as a possible diligence vendor but decided not to use them.  SUF ¶ 210.

a loan complied with the "policy," then SURF would purchase and securitize the loan even though it did not comply with SURF's published guidelines.

SURF would also sometimes adjust its diligence processes to satisfy originators.  In one email exchange, a SURF salesperson emailed Ms. Lacey with a list of potential kickout loans and asked if she would "please take a look at the first tab quickly and let me know if we could include some of these loans if competitive pressures require us to include more loans."  SUF ¶ 216.  Ms. Lacey responded with a list of "preferred declines" but also said to "[d]o what you need to do and we will back you up."  SUF ¶ 216.  There is no evidence SURF shared with investors its internal exceptions policy, or its willingness to buy loans flagged as unsuitable for purchase due to "competitive pressures."

## ARGUMENT

On a motion for summary judgment, "[t]he moving party bears the burden of demonstrating the absence of a material factual question," *In re WorldCom*, 346 F. Supp. 2d at 655, and, as such, has "the initial responsibility of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact," *id.* (ellipsis and quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  *Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 200 (2d Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Even if the parties dispute material facts, summary judgment will be granted unless the dispute is 'genuine,' *i.e.*, unless 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'"  *Id.* (quoting *Anderson*, 477 U.S. at 249).  "When the moving party has asserted facts showing that it is entitled to summary judgment, the opposing party must

32

'set forth specific facts showing that there is a genuine issue for trial,' and cannot rest on the 'mere allegations or denials' of the movant's pleading." *In re WorldCom*, 346 F. Supp. 2d at 655-56 (quoting Fed. R. Civ. P. 56(e)).

Where, as here, a plaintiff moves for summary judgment on a defendant's affirmative defense, "[t]he showing required of Plaintiffs in their challenge to the legal sufficiency of [defendants'] asserted due diligence defense … is significantly lessened, for the defendants must 'sustain the burden of proof' as to their due diligence under the standards established by" the relevant statute. *In re Livent, Inc.*, 355 F. Supp. 2d at 729 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). "'Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case.'" *Id.* (quoting *FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994)). Thus, in order to defeat summary judgment on its affirmative defense of due diligence, Merrill Lynch must "come forward with evidence supporting each essential element of [its] defense," *id.*, for each misrepresentation at issue, *see In re WorldCom*, 346 F. Supp. 2d at 680-82 (reasoning that the absence of a genuine issue of material fact as to an underwriter's due diligence on one misrepresentation had no effect on the presence of a genuine issue on other misrepresentations).

## I.   MLMI HAS NO DUE DILIGENCE DEFENSE AS A MATTER OF LAW

MLMI, which is liable for the misstatements and omissions of material fact in the Prospectus Supplements for 60 Securitizations—the 47 WLTD Securitizations plus the 13 SURF Securitizations—has no due diligence defense. Merrill Lynch admits that MLMI was the depositor for these 60 Securitizations. First Amended Compl. ¶¶ 20, 38 & tbl.2; First Amended Answer ¶¶ 20, 38. A depositor is, by both statutory and regulatory definition, an issuer for

purposes of the Securities Act. *See* 15 U.S.C. § 77b(a)(4) (defining "issuer" to mean "the person

or persons performing the acts and assuming the duties of depositor or manager pursuant to the

provisions of the trust or other agreement or instrument under which such securities are issued");

17 C.F.R. § 230.191(a) ("The depositor for the asset-backed securities acting solely in its

capacity as depositor to the issuing entity is the 'issuer' for purposes of the asset-backed

securities of that issuing entity."); *FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 334

(S.D.N.Y. 2012) (concluding that depositors are "issuers" for Securities Act purposes). "[T]he

liability of issuers under Section 11 is 'virtually absolute,'" *id.* at 329 (quoting *In re Morgan*

*Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)), such that under the plain

language of 15 U.S.C. § 77k(b), an issuer has no due diligence defense, *UBS*, 858 F. Supp. 2d at

329. *See also Herman & MacLean*, 459 U.S. at 382 (issuers have "virtually absolute" liability

"even for innocent misstatements" and have no due diligence defense); *Ernst & Ernst v.*

*Hochfelder*, 425 U.S. 185, 208 (1976) ("[T]he issuer of the securities is held absolutely liable for

any damages resulting from such misstatement or omission" and does not have a "due diligence"

defense); *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir. 1973) ("A

'due diligence' defense to such a suit is available to all but the issuer."). For this reason alone,

there is no genuine dispute of material fact that MLMI, and thus Merrill Lynch, has absolute

liability for the 60 Securitizations for which MLMI was the issuer.

## II.    MLPFS'S DILIGENCE WAS INADEQUATE AS A MATTER OF LAW

Nor are there genuine disputes of material fact about the diligence that MLPFS conducted

in connection with the Securitizations, and those facts show that MLPFS cannot take advantage

of the "due diligence" affirmative defense under Section 11 as a matter of law. While MLPFS

was supposed to "exercise a high degree of care in investigation and independent verification of

the [issuer's] representations," *In re WorldCom, Inc.*, 346 F. Supp. 2d at 662 (brackets, internal

citations, and quotations omitted), MLPFS abdicated its responsibility, violating both the plain language of Section 11 and the well-established requirement that an underwriter "must play devil's advocate," *id.* at 675 (quotation marks omitted) (quoting *Feit*, 332 F. Supp. at 582).

### A.   MLPFS Faces A Heightened Burden Of Proof Because It Was Completely Intertwined With Merrill Lynch's Issuer, MLMI

MLPFS faces an especially high burden of proof for its due diligence defense because it was entirely intertwined with MLMI.  To defeat summary judgment, MLPFS must create a genuine issue of material fact that shows both "[1] that [it] conducted a reasonable investigation and [2] that after such an investigation that [it] had reasonable ground to believe that the statements in the Registration Statements … were true."  *In re WorldCom*, 346 F. Supp. 2d at 682.  The *sine qua non* of an underwriter's diligence is "a high degree of care in investigation and ***independent*** verification of the company's representations," which requires a "thorough or searching inquiry."  *Id.* at 676, 678 (quotation marks omitted) (emphasis added).  Even for a truly independent underwriter, "[t]he burden of proof [MLPFS] must satisfy on summary judgment … is a heavy one."  *In re Livent*, 355 F. Supp. 2d at 733.

Because MLPFS and MLMI did not have an independent, arms-length underwriter-issuer relationship, MLPFS's burden of proving a due diligence defense is especially high.  For decades, courts have made clear that "[t]he reasonable investigation-verification-requirement is simply one means of promoting the full disclosure policy of Section 11," *Feit*, 332 F. Supp. at 577, a policy that turns on "the importance of the role played by each participant in the scheme of distribution," *id.*  The underwriter is "the first line of defense with respect to material misrepresentations and omissions in registration statements," *In re Worldcom*, 346 F. Supp. 2d at 662 (quotation marks omitted), but only when the underwriter "assume[s] an ***opposing*** posture with respect to [the issuer's] management."  *Feit*, 332 F. Supp. at 581 (emphasis added); *see also*

*Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643, 696 (S.D.N.Y. 1968) ("In a sense, the positions of the underwriter and the company's officers are adverse."). According to Judge Weinstein, "*[s]uch adversity is required* since the underwriter is the only participant in the registration process who … is able to make the kind of investigation which will protect the purchasing public." *Feit*, 332 F. Supp. at 581 (emphasis added).

As a result, courts recognize that the closer the ties between an issuer and underwriter, the greater the underwriter's burden of proving a due diligence defense. *E.g.*, *In re WorldCom*, 346 F. Supp. 2d at 675 ("[W]hat constitutes 'reasonable investigation' and a 'reasonable ground to believe' will vary with the degree of involvement of the [underwriter], [its] expertise, and [its] access to the pertinent information and data") (quoting *Feit*, 332 F. Supp. at 577); *Univ. Hill Found. v. Goldman, Sachs & Co.*, 422 F. Supp. 879, 900 (S.D.N.Y. 1976) (in assessing Goldman Sachs' diligence, holding that, "[b]ased on the role it played in marketing Penn Central notes, Goldman, Sachs' credit investigation must be judged by a fairly rigorous standard"); *see also* 17 C.F.R. § 230.176(g) (whether an underwriter's investigation or ground for belief is reasonable turns on "the type of underwriting arrangement, the role of the particular person as an underwriter and the availability of information with respect to the registrant"). Thus the underwriter in *Feit* was able to "barely" meet its due diligence defense only because of "the underwriter's independence from the issuer." *In re WorldCom*, 346 F. Supp. 2d at 675.

Where the underwriter is not independent of the issuer, however, it will almost always be liable. A close analogy is the showing necessary for a director to prove a due diligence defense; in that context, the seminal decision in "*BarChris* created 'a sliding scale of liability' among directors, 'drawing a distinction between insiders and outsiders.'" *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 638268, at *9 (S.D.N.Y. Mar. 21, 2005) (brackets omitted) (quoting 1 Thomas

36

Lee Hazen, Law of Sec. Reg. § 7.4[2][A][1] (4th ed. 2002)).  Inside directors, who have

"intimate knowledge of corporate affairs and of the particular transactions[,] will be expected to

make a more complete investigation and have more extensive knowledge of facts supporting or

contradicting inclusions in the registration statements than outside directors."  *Id.* (quoting *Feit*,

332 F. Supp. at 578).  Where a defendant is so heavily intertwined with the issuer, "liability will

lie in practically all cases of misrepresentation.  [The defendant's] liability approaches that of the

issuer as guarantor of the accuracy of the prospectus."  *Feit*, 332 F. Supp. at 578.

 Here, because MLPFS and MLMI were wholly intertwined, MLPFS's burden of proof is

increased to the point that its liability "approach[es] that of the issuer."  As Merrill Lynch's Rule

30(b)(6) witness explained, MLMI "was not functioning as an operating company where it had

other business activities or functions, nor did it have any employees or really act as an operating

company." SUF ¶ 8.  During the relevant time period, all but one of MLMI's officers and

directors were "employees of [MLPFS]" (SUF ¶¶ 9, 11), MLMI had no office space other than

MLPFS's location (SUF ¶ 14), MLMI had no capital apart from funds provided by the ultimate

corporate parent of both MLMI and MLPFS, Merrill Lynch & Co. (SUF ¶ 13), and MLMI did

not maintain its own accounting books and records (SUF ¶ 12).

 MLPFS's burden is even greater than that of an inside director with "intimate knowledge

of corporate affairs and of the particular transactions[,]"  *In re WorldCom*, 2005 WL 638268, at

*9 (quoting *Feit*, 332 F. Supp. at 578), because, as a practical matter, MLPFS *was* MLMI.

MLMI had a single function—to create trusts that MLPFS would use to distribute securities

(SUF ¶ 8).  The same WLTD loan traders who selected the loans that MLMI would securitize

also oversaw the diligence that Ms. Alexander's and Mr. Amoroso's group conducted on those

loans for MLPFS.  SUF ¶¶ 24-25.  Because MLMI and MLPFS were functionally the same

entity,[32] it was ***impossible*** for MLPFS to "play devil's advocate" against MLMI, or to conduct

the "independent verification of [MLMI's] representations" required of underwriters.  *In re*

*WorldCom*, 346 F. Supp. 2d at 675-76 (quoting *Feit*, 332 F. Supp. at 582).[33]  Because MLMI was

a shell corporation directed and operated entirely by employees of MLPFS, MLPFS's liability

"will lie in practically all cases," including this one.  *Feit*, 332 F. Supp. at 578.

### B.    MLPFS Failed To Conduct A Reasonable Investigation Up To The Effective Date Of The Prospectus Supplements

Under any burden of proof, FHFA would still be entitled to summary judgment as to

MLPFS's due diligence defense for the WLTD and SURF Securitizations because there is no

genuine issue of material fact that MLPFS failed to conduct an investigation "at the time such

part of the registration statement became effective."  15 U.S.C. § 77k(b)(3)(A).  It is well-

established that "[a] failure by the underwriters … to consider new information up to the

effective date of an offering would almost certainly constitute a lack of due diligence."  *In re*

*WorldCom*, 346 F. Supp. 2d at 677 (quoting *Glassman v. Computervision Corp.*, 90 F.3d 617,

629 (1st Cir. 1996)); *see also In re Software Toolworks Inc.*, 50 F.3d 615, 625 n.2 (9th Cir. 1995)

(denying summary judgment on due diligence defense to underwriter that failed to investigate

intra-quarterly information available before the effective date); *BarChris*, 283 F. Supp. at 690

(denying summary judgment on due diligence defense to underwriter that copied "large portions"

of prospectus issued in May from one issued in January because "[s]tatements that were accurate

in January were no longer accurate in May.").

---

[32]   Merrill Lynch's own proffered expert makes no distinction between the MLPFS and MLMI entities.  *See generally* Little Report (opining on adequacy of the diligence of "Merrill Lynch").

[33]   If trial were necessary to resolve the adequacy of Merrill Lynch's due diligence defense, evidence of MLMI and MLPFS's interconnectedness would be sufficient to pierce the corporate veil between the two and, as such, MLPFS would have the same liability of the issuer, MLMI, which cannot assert a due diligence defense.  *Brady v. UBS Fin. Servs., Inc.*, 2013 WL 1309250, at *34-35 (N.D. Okla. Mar. 26, 2013) (denying underwriter defendant's motion for summary judgment in the Section 11 context because similar indicia of integration between underwriter and issuer "raise a genuine issue of material fact as to whether [the issuer] and [the underwriter] operated as a single economic unit.").

The Prospectus Supplements became effective on "the date each prospectus supplement was filed," *FHFA v. UBS Americas, Inc.*, 2012 WL 2400263, at *5 (S.D.N.Y. June 26, 2012), and the Prospectus Supplements form part of the registration statements for purposes of Section 11, *FHFA v. HSBC N. Am. Holdings Inc.*, --- F. Supp. 2d ----, 2013 WL 6480445, at *3 (S.D.N.Y. Dec. 10, 2013) (citing 17 C.F.R. § 230.430B(f)(1)). Thus, MLPFS was required to conduct diligence on the statements in the Prospectus Supplements up until they were filed.

The undisputed facts, however, are that the only loan-specific diligence MLPFS conducted was done at acquisition, which occurred months before the issuance of the Prospectus Supplements for the WLTD or SURF Securitizations. SUF ¶¶ 84, 91. MLPFS relied entirely on diligence performed when the WLTD and SURF acquired pools of loans from originators and sellers (*e.g.*, SUF ¶¶ 90, 92), based on the legally incorrect belief that "there was no need" to conduct additional diligence because "it had already been done" (SUF ¶ 92). As a result, MLPFS did not consider any information that became available to it, as owner of the loans, between acquisition and securitization. MLPFS ignored the information even though MLPFS personnel were aware that post-acquisition information could call into question the accuracy of the representations regarding the loans in the Prospectus Supplements. SUF ¶¶ 186-88.

MLPFS's failure to conduct diligence "up to the effective date of an offering … certainly constitute[s] a lack of due diligence" here. *In re WorldCom*, 346 F. Supp. 2d at 677 (quotation marks omitted). MLPFS cannot meet the plain language of the due diligence defense, because it failed to conduct any investigation into—let alone form a reasonable ground for a belief in the truth of—the Prospectus Supplements "at the time [they] became effective." 15 U.S.C. § 77k(b)(3)(A). MLPFS was perfectly capable of performing diligence at the time of issuance— as it did for the Third-Party Securitizations (SUF ¶ 96)—but it chose not to do so for the WLTD

or SURF Securitizations, despite the express requirements of Section 11.  In light of the stringent burden of proof Merrill Lynch must meet in order to prove its defense for each Securitization, summary judgment should be granted to FHFA regarding the 60 WLTD and SURF Securitizations on this ground alone.

### C.   MLPFS Failed To Conduct Any Diligence On The Statements In The Prospectus Supplements

MLPFS's failure to conduct any independent investigation into the truth of the statements in the Prospectus Supplements is another independent reason to grant FHFA's motion regarding *all* of the Securitizations.  By its express terms, the due diligence defense applies only where an underwriter has reviewed the relevant offering materials and conducted a "reasonable investigation … that *the statements therein* were true and that there was no omission to state a material fact required to be stated therein or necessary to make *the statements therein* not misleading."  15 U.S.C. § 77k(b)(3)(A) (emphases added).  Even if MLPFS had investigated the quality of the mortgage loans underlying the Securitizations at the time the Prospectus Supplements became effective—which it did not—MLPFS cannot invoke the due diligence defense because it did not investigate the truth of the statements regarding the securitized loans in the Prospectus Supplements.

Reviewing the actual statements in the registration statement is a key requirement of an underwriter's diligence obligations.  In a recent case in this district, the court granted the plaintiff's motion for summary judgment on the due diligence defense where, *inter alia*, the defendant directors did not review the registration statement at all, but instead "completely relied on … outside personnel to ensure the Registration Statement's accuracy."  *In re Livent*, 355 F. Supp. 2d at 737.  In contrast, in *Feit*, the underwriter was "just barely" able to take advantage of the due diligence defense where "representatives of the [issuer] and the [underwriter] reviewed

40

the proposed registration statement line by line."  332 F. Supp. at 582; *see also In re WorldCom*, 346 F. Supp. 2d at 675-76 ("[r]ecent Section 11 case law … shows no signs of abandoning early courts' demand that underwriters employ 'a high degree of care in investigation and independent verification of the company's representations.'" (quoting *Feit*, 332 F. Supp. at 582)).  Thus, to meet its high burden, MLPFS will have to present admissible evidence that, for each Securitization, it conducted a detailed review of the statements in the Prospectus Supplements.

MLPFS cannot make that showing for any Securitization.  It is undisputed that WLTD diligence employees never investigated the statements in the Prospectus Supplements for the WLTD and Third-Party Securitizations.  MLPFS's diligence employees repeatedly testified that they never reviewed the Prospectus Supplements at all, let alone verified the accuracy of the statements regarding the loans underlying the WLTD or Third-Party Securitizations.  SUF ¶¶ 168-72.  Ms. Alexander was explicit: no one in her group was involved in any way or at any time in conducting diligence on the Prospectus Supplements.  SUF ¶ 169.  MLPFS never considered verifying the accuracy of the loan descriptions in each Prospectus Supplement to be its legal obligation; rather, MLPFS believed its only "legal and moral/client" obligation to be its exposure to EPDs and FPDs.  SUF ¶ 93.  As Mr. Podlasek testified, despite being one of three employees conducting diligence on the WLTD and Third-Party Securitizations, he never once reviewed a Prospectus Supplement, nor was he even aware what representations such a document might contain.  SUF ¶¶ 171-72.[34]  Similarly, there is no evidence that SURF's

---

[34]   Merrill Lynch's proffered expert confirms Merrill Lynch's failure to verify the representations in the offering documents.  Mr. Little does not cite to any evidence that Merrill Lynch employees verified the representations in the prospectus supplements.  *See* Little Report ¶¶ 87-129.  While Mr. Little refers to a data integrity review performed by Merrill Lynch employees, that review was designed to "correct any potential errors" in the data tape (*see* Little Report ¶ 126), not to confirm whether the information in the loan tape or loan files was accurate, much less whether the statements in the prospectus supplements were accurate (*see* SUF ¶ 80).

diligence team ever verified the accuracy of the statements in the Prospectus Supplements for the SURF Securitizations.

Merrill Lynch cannot rely on Deloitte's limited review, *see* n.19*, supra*, as diligence performed on the statements in the Prospectus Supplements. The longstanding rule is that, "[t]o effectuate the statute's purpose, the phrase 'reasonable investigation' must be construed to require more effort on the part of the underwriters than the mere accurate reporting in the prospectus of 'data presented' to them." *In re WorldCom*, 346 F. Supp. 2d at 675 (quoting *BarChris*, 283 F. Supp. at 697)). Deloitte's review of a sample of loans was limited to whether information in the loan tapes ***matched*** the information in the loan files, not whether the information in the loan files (or the loan tapes) was ***accurate***. Deloitte specifically disclaimed any role in the "verification of any of the information set forth on the Loan Documents" and "ma[d]e no representations concerning the accuracy or completeness of any of the information contained therein." SUF ¶ 80. MLPFS employees did not "consider Deloitte results as due diligence." SUF ¶ 81. Consequently, there is no genuine dispute that MLPFS failed to investigate or have a reasonable ground to believe that "the statements" in the Prospectus Supplements were accurate as required by Section 11's text. 15 U.S.C. § 77k(b)(3)(A).

**D.     MLPFS Failed To Conduct Any Investigation As To The Vast Majority Of Loans In The SLGs**

MLPFS was required to reasonably investigate the veracity of ***all*** the statements in the Prospectus Supplements, not just some of them. 15 U.S.C. § 77k(b)(3)(A). The plain language of the Securities Act requires an underwriter to conduct a "thorough or searching inquiry" that is done "with systematic attention to detail and relationship." *In re WorldCom*, 346 F. Supp. 2d at 678 (quotation marks omitted); *see also Feit*, 332 F. Supp. at 582-83 (due diligence defense met where underwriter conducted "searching inquiries" of the issuer, including a "line by line"

review of the registration statement). Under Section 11, MLPFS was required, at a minimum, to devise and follow a process that provided visibility into *all* the loans MLMI securitized. But instead of a thorough, searching, and systematic procedure, the WLTD developed an *ad hoc* system of non-statistical "sampling" that revealed nothing about the quality of the SLGs.

The WLTD did not conduct diligence on all of the loans that actually collateralized the WLTD Securitizations, nor did it perform diligence on samples of loans drawn from the SLGs— let alone on scientifically constructed, statistically representative samples that could be extrapolated to the SLGs as a whole. SUF ¶ 137. Instead, the WLTD conducted diligence only on so-called "samples" of loans drawn from acquisition pools months before they were securitized. SUF ¶ 102. But there is no evidence that Merrill Lynch knew or tracked whether and which diligenced loans from the acquisition pools were included in the Securitizations, the percentage of loans in any SLG subjected to diligence, or the actual credit quality of the unsampled, undiligenced loans in the SLGs.[35] MLPFS compounded this problem by routinely including loans in the SLGs from multiple acquisition pools. As shown in Exhibit 1 to the Cipione Declaration, by doing so, the WLTD often diluted its diligence to the point of being meaningless: for 16 of the 47 WLTD Securitizations, the WLTD conducted diligence at the time of acquisition on less than fifteen percent of the loans that, months later, were placed into the SLGs, and often much less.[36] For example, for the FFMER 2007-H1 Securitization, the WLTD

---

[35]   As noted previously, the Little Report provides no opinion or evidence on diligence performed on the loans at issue—those underlying the SLGs. Instead, Little relies entirely on samples selected from the acquisition pools. *See* Little Report Exs. 6A-D.

[36]   Even if there were evidence that the WLTD were extrapolating its diligence of the sample of an acquisition pool to the entire acquisition pool—and as discussed in text, there is none—Merrill Lynch cannot establish that the WLTD's results could be reliably extrapolated to the SLG, because the SLG is only a subset of those pools. *See, e.g., Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade Cnty.*, 943 F. Supp. 1546, 1560 n.16 (S.D. Fla. 1996) (noting that where groups combined for statistical analysis are "more heterogeneous," it is "less likely the … analysis will be reliable"), *aff'd*, 122 F.3d 895, 919 n.4 (11th Cir. 1997); *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 637 n.12 (9th Cir. 2010) (en banc) (Ikuta, J., dissenting) (discussing same), *majority decision rev'd*, 131 S. Ct. 2541 (2011). As Merrill Lynch previously argued to this Court, "[e]ach certificate is a separate security, generally

43

conducted diligence on no loans in the SLG.  *See* Little Report ¶ 89 & n.27 ("I did not review

due diligence results concerning … FFMER 2007-H1 due to a lack of sufficient due diligence

documentation currently available regarding [this] securitization[].").  Because Merrill Lynch

cannot present any evidence that such acquisition-stage diligence resulted in statistically

representative samples of the loans in the SLG—let alone that were extrapolated to the SLG as a

whole—selling a residential mortgage-backed security without examining the vast majority of

the loans backing the security fails, as a matter of law, to meet the "thorough" and "searching"

standard that Section 11 demands.  *See In re WorldCom*, 346 F. Supp. 2d at 678.

     Furthermore, the WLTD's ramshackle diligence system prevented it from conducting

follow-up investigation into the red flags raised by the limited analysis the WLTD conducted.

"[A]n underwriter conducting a due diligence investigation must 'look deeper and question

more' when confronted with red flags."  *In re WorldCom*, 346 F. Supp. 2d at 677 (quoting *In re

Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 707 (S.D. Tex. 2002)).  The

existence of "red flags" or "storm warnings" functions "to render [an underwriter's] normal

procedures inadequate and to require more concrete verification."  *Univ. Hill Found.*, 422 F.

Supp. at 902 (when confronted with red flags, the underwriter's "exclusive reliance on publicly

available data and the unverified representations of management [was] inadequate to meet its

obligation to the investing public.").

     Rather than view the presence of loans graded EV3s in its samples as suggestive that other

EV3 loans could be in the rest of the pool, the WLTD made no effort to extrapolate even its

unscientific diligence results to the overall SLGs.  As Merrill Lynch made clear to this Court,

"[t]he failure to choose an appropriate extrapolation methodology undermines the sampling

---

collateralized by a unique set of loans and governed by a unique set of disclosures about those loans."  Dkt. No. 129,
at 11.  As a matter of statistics, the WLTD therefore could not simply assume that its diligence on several pools
could provide any robust estimate about the "unique set of loans" in the SLG.

methodology as a whole."  Dkt. No. 129, at 21; *see also* Dkt. No. 131, at 26 (Merrill Lynch's

sampling expert agreeing that "sampling and extrapolation are closely intertwined; using an

inappropriate extrapolation methodology could undermine any potential benefits gained by

sampling").  Ms. Alexander was clear that the WLTD did not make "any effort … to extrapolate

back [] what [it] found from the random samples to the rest of the loan pool."  SUF ¶ 135.  The

WLTD thus did not "look deeper and question more," *In re WorldCom*, 346 F. Supp. 2d at 677

(internal citations and quotation marks omitted), when presented with evidence that the

acquisition pools likely contained other loans that did not comply with the originator's

guidelines; indeed, Mr. Mora, the head of the WLTD, said that the WLTD believed that it was

"supposed to rely on" the representations and warranties from their "clients."  SUF ¶¶ 83, 136.

This belief, of course, is not the law, which required the WLTD, as part of MLPFS, to

conduct its own, independent review that did not rely on representations provided to the issuer.

*In re WorldCom*, 346 F. Supp. 2d at 676-77.  And where, as here, the WLTD had "intimate

knowledge of [MLMI's] affairs"—because MLPFS was entirely intertwined with MLMI—it was

required to conduct "a more complete investigation and have more extensive knowledge of facts

supporting or contradicting inclusions in the registration statements than" a normal underwriter.

*In re WorldCom*, 2005 WL 638268, at *9 (quoting *Feit*, 332 F. Supp. at 578).  The WLTD's

unscientific and *ad hoc* diligence fails that standard beyond peradventure.

### E.     MLPFS's Diligence Was Inadequate As A Matter Of Law

Even if MLPFS could rely on its acquisition-stage diligence to satisfy its stringent burden

of proof—and for the reasons given in Parts II.A-II.D, *supra*, it cannot—the diligence that

MLPFS actually conducted is inadequate as a matter of law, and summary judgment that MLPFS

cannot prove its due diligence defense is therefore appropriate.

1.      Despite Serious Concerns About The Work Performed By Its Diligence
        Vendors, The WLTD Failed To Review The Loans That Its Vendors
        Identified As Complying With Guidelines

MLPFS ignored a series of red flags that affected all of the WLTD and Third-Party

Securitizations, which "render[ed] [its] normal procedures inadequate and … require[d] more

concrete verification."  *Univ. Hill Found.*, 422 F. Supp. at 902.  Even though the WLTD had

serious concerns about the quality of its third-party diligence vendors, it did not investigate

whether those vendors were properly grading loans as complying with originator guidelines.  Ms.

Alexander had a "frustrated view" of both Clayton and Bohan, recognizing that these firms were

making "serious mistakes" and that "they were missing things, that there might have been a

misunderstanding of underwriting guidelines" (SUF ¶¶ 148-50), and she was "very scared" of

Bohan's results (SUF ¶ 153).  In fact, Ms. Alexander put both Clayton and Bohan in the "penalty

box," limiting their use to try to force them to improve.  SUF ¶ 151.  The WLTD's serious

concerns with the accuracy of its third-party diligence firms are precisely the type of red flags

that "strip[] a defendant of his confidence in the accuracy" of those firm's diligence reports, and

this Court has been clear that "blind reliance," *In re Livent*, 355 F. Supp. 2d at 738, on such

reports is "not [] sufficient to ward off liability."  *In re WorldCom*, 346 F. Supp. 2d at 672-73.

Rather, "more concrete verification" was required.  *Univ. Hill Found.*, 422 F. Supp. at 902.

But instead of asking more questions and conducting greater investigation in response to

these red flags, MLPFS failed to investigate whether loans graded by Clayton or Bohan as EV1s

actually complied with originator guidelines or whether loans graded by those vendors as EV2s

actually had sufficient and documented compensating factors.  Instead, as Ms. Alexander

testified, for EV2 and EV1 loans, "all I would have to look over" is the loan-grade "summary

sheet" prepared by the vendors.  SUF ¶ 156.  Even though Mr. Mora acknowledged that Bohan

was "only as good as the direction we give them" (SUF ¶ 155), there is no evidence that the

WLTD ever looked at loan files to challenge an initial grade of EV1 or EV2 issued by Bohan or Clayton.  This is precisely the type of "blind reliance" that is insufficient as a matter of law to satisfy the due diligence defense on all of the WLTD and Third-Party Securitizations.

2.  The WLTD Actively Facilitated The Securitization Of Loans That Did Not Meet Underwriting Guidelines

In sharp contrast to the WLTD's approach to loans graded EV1 or EV2, the WLTD made every effort to securitize loans that they graded as EV3s—*i.e.*, loans that did not comply with originators guidelines.  For such EV3 loans, the WLTD's diligence teams reviewed "the widest swath" of such loans (SUF ¶ 157) so that it could "overturn[] as many [EV3] loans as possible" and securitize those loans (SUF ¶ 159).  Far from "function[ing] as the first line of defense," *In re WorldCom*, 346 F. Supp. 2d at 662 (quotation marks omitted), the WLTD's diligence team identified numerous loans graded as EV3s to WLTD traders with the invitation to "[l]et me know how many of these you want to override my decision on."  SUF ¶ 164.

Moreover, despite the excessive number of EV3s that third-party vendors identified, there is no evidence that the WLTD's diligence team conducted additional diligence or took additional measures with regard to the remaining loans in the pool that were outside of its initial sample.  The WLTD's diligence teams could have increased the sample sizes upon discovery of EV3s among the acquisition pools, or used statistically representative samples that could have been extrapolated to the pool as a whole (SUF ¶¶ 46-47), but they typically and consciously made no effort to do so (SUF ¶¶ 134-36).  While Ms. Alexander testified that she "believe[d] there were times we did increase the sample" (SUF ¶ 112), Mr. Mora testified that although his approval was required to increase the sample size, he recalled increasing the original sample size for only one "very small pool" (SUF ¶ 113).  At times, although the WLTD's diligence teams sought to increase the sample size, stipulations setting the sample size reached by the WLTD traders or

47

complaints from the WLTD's clients—third-party originators—prevented the WLTD diligence

personnel from doing so.  SUF ¶¶ 111, 114.  Therefore, while there is evidence of large numbers

of EV3s found in the acquisition pools of the WLTD Securitizations (SUF ¶¶ 157, 159-60), there

is no evidence that the WLTD diligence teams ever increased the sample size or took any action

to address the loans outside the sample that did not abide by the originators guidelines.

Even when the WLTD's diligence team did grade a loan as an EV3, the MLPFS traders so

routinely overruled the WLTD's diligence group (*e.g.*, SUF ¶¶ 164, 166) that Mr. Podlasek wrote

to Ms. Alexander that it "[m]akes you wonder why we have due diligence performed other than

making sure the loan closed," (SUF ¶ 167).  Similarly, Mr. Podlasek regularly received orders

from WLTD traders that large groups of loans should be securitized, even when Mr. Podlasek

had uncovered that the loans should have been dropped for valuation reasons.  SUF ¶ 165.

MLPFS routinely securitized loans that the WLTD diligence team knew did not meet applicable

underwriting guidelines.  The loans in the "2006-15p1" acquisition pool, for example, were

securitized "regardless of issues" (SUF ¶ 167) into three WLTD Securitizations at issue, OWNIT

2006-4, OWNIT 2006-5, and MLMI 2007-HE2 (Cipione Decl. ¶ 24).  Other evidence

demonstrates that loans graded EV3s due to, for example, missing documentation, excessive

LTV ratios, and appraisal-related issues were routinely securitized.  Cipione Decl. ¶ 15.  In one

case, the WLTD securitized a loan in the FFMER 2007-4 Securitization despite its third-party

vendor's grading of the loan as EV3 based on a finding that the loan was a "non arms length

transaction—borrower is a branch manager of mortgage broker originating loan" and the

"[s]tated income appear[ed] unreasonable."  *See* Cipione Decl. ¶ 15.

MLPFS's widespread efforts to securitize as many loans as possible regardless of credit,

compliance or valuation issues defeats its due diligence defense as a matter of law.  In *In re*

48

*Livent*, the court granted the plaintiff's motion for summary judgment on the defendant's due diligence defense based on the undisputed record "that, far from seeking to ensure that the [transaction at issue] was properly accounted for in the Registration Statement, [the defendant officers] instead actively facilitated its improper accounting treatment."  355 F. Supp. 2d at 736. The WLTD engaged in the same type of "active facilitation" that was held to be dispositive in *In re Livent*—it actively sought to securitize as many loans as possible, with full knowledge that its vendors or its own diligence department had identified loans that did not comply with underwriting guidelines.  MLPFS is thus not entitled to a due diligence defense for any of the Securitizations as a matter of law.  *See id.*

### 3. The WLTD Ignored Red Flags Related To Loans Originated By First Franklin And Ownit

Deep concerns about vendor confidence and systematic overturning of loans graded as EV3s were not the only red flags that the WLTD ignored.  The WLTD also knew about significant storm warnings relating to the quality of loans originated by First Franklin and Ownit, two originators in which Merrill Lynch had an ownership interest, and yet did nothing.  In November 2006, Merrill Lynch audited certain Ownit loans, which Ms. Alexander recognized raised serious red flags about the WLTD's entire diligence process:  "I want to be sure that all know many of these loans would not have been purchased if we had the opportunity to perform due diligence prior to funding."  SUF ¶ 123.  Likewise, when Ms. Alexander and Ms. Lacey both recommended that certain loans be excluded from a pool of First Franklin-originated loans, Mr. Whalen ignored their concerns and overruled them, deferring to First Franklin:  "[i]f you [First Franklin] are comfortable that these loans are normal/acceptable quality it is your call … Pl[ease] coordinate with [another First Franklin employee] to make sure all loans get into [the

REDACTED

FFMER 2007-3 Securitization].”  SUF ¶ 177.  In fact, Mr. Whalen, who earned ████████ ████ over the time period (SUF ¶ 35), viewed such diligence as “a wasted cost” (SUF ¶ 178).

These warnings about the quality of Ownit and First Franklin loans that the WLTD securitized are quintessential “‘warning signals’ to [an] underwriter that something more might be in order.’”  *In re WorldCom*, 346 F. Supp. 2d at 677 (some quotation marks and brackets omitted) (quoting *Univ. Hill Found.*, 422 F. Supp. at 900).  Once MLPFS began to “question the accuracy” of the data presented to it, the WLTD was required “to make sufficient inquiry to satisfy [itself] as to the accuracy of” the originators’ representations.  *Id.* at 684.  As this Court has made clear, if an underwriter is “unsatisfied” with the accuracy of such information, it has three options: “demand disclosure, withdraw from the underwriting process, or bear the risk of liability.”  *Id.*  The WLTD rejected the first two paths, abdicating its statutory responsibilities as a “wasted cost” and instead telling originators that Merrill Lynch owned that “it is your call” if the loans were securitized.  As a result, for the WLTD Securitizations containing Ownit loans issued after October 2005 and for the WLTD Securitizations containing First Franklin loans issued after January 1, 2007, MLPFS must “bear the risk of liability” as a matter of law.[37]

4.   The WLTD’s *Ad Hoc* Diligence Procedures Are Insufficient As A Matter Of Law To Prove Its Due Diligence Defense

Even if the red flags discussed above did not exist, “in order for [Merrill Lynch’s due diligence] defense to survive summary judgment, [Merrill Lynch] must introduce evidence that would support a finding at trial that materially misleading information was incorporated into the [Prospectus Supplements] *despite* [Merrill Lynch’s] reasonable efforts to ensure the [Prospectus Supplements’] accuracy.”  *In re Livent*, 355 F. Supp. 2d at 733.  Because the value of the WLTD

___
[37]   These Securitizations include:  OWNIT 2005-4; OWNIT 2005-5; OWNIT 2006-1; OWNIT 2006-2; OWNIT 2006-3; OWNIT 2006-4; OWNIT 2006-5; OWNIT 2006-6; OWNIT 2006-7; FFMER 2007-1; FFMER 2007-2; FFMER 2007-3; FFMER 2007-4; FFMER 2007-5; FFMER 2007-H1; FFML 2007-FF1; and FFML 2007-FF2.

50

Securitizations was tied directly to the mortgage loans serving as collateral, MLPFS was required to examine the quality and characteristics of those mortgage loans with the "'systematic attention to detail and relationship'" that the due diligence defense requires.  *In re WorldCom*, 346 F. Supp. 2d at 678 (quotation mark omitted) (quoting Webster's New International Dictionary of the English Language 1306 (2d ed. 1934)).  Merrill Lynch must also introduce evidence sufficient to raise a material issue of fact that it is entitled to a due diligence defense for each of the WLTD Securitizations.  *See id.* at 680-82.  The WLTD's motley diligence procedures fail this test for each of the 47 WLTD Securitizations for four independent reasons.

*First*, there is no evidence that the WLTD ever established a systematic method for conducting diligence.  WLTD had no written policies or procedures governing how to conduct diligence.  SUF ¶¶ 47-52.  Nor is there any evidence that any so-called diligence processes or procedures in place were changed upon becoming aware, as early as the first quarter of 2006, of a rise in delinquencies in the loans acquired by the WLTD.  SUF ¶ 219; *see UBS*, 858 F. Supp. 2d at 321 (noting that ignoring public information "negates any effort by defendants to maintain that they exercised due diligence or reasonable care to ensure that the loans included in the securitizations were as described.").  Moreover, the WLTD diligence employees were not formally trained.  SUF ¶ 53.  The WLTD's diligence teams were likewise inadequately staffed.  SUF ¶¶ 29-31.  And as discussed in Part II.E.1, *supra*, the WLTD did not trust the third-party diligence firms' work product.  MLPFS's sclerotic, haphazard diligence procedures thus fail as a matter of law to qualify for the "thorough and searching inquiry" required by the Securities Act. *In re WorldCom*, 346 F. Supp. 2d at 678 (quotation marks omitted).

*Second*, the WLTD's diligence practices were entirely driven by profit, not accuracy. The size of the samples that the diligence personnel were allowed to review turned not on the

need to conduct an analysis "with systematic attention to detail and relationship," *In re WorldCom*, 346 F. Supp. 2d at 678 (quotation mark omitted), but rather on the economics of the deal the WLTD's traders made with originators (SUF ¶ 106).  The WLTD viewed originators as their "client[]s," (SUF ¶ 83), and when the client objected to the size of the WLTD's sample, the WLTD acquiesced.  And so, although Ms. Alexander "would have preferred to [review] 100 percent" of the loans in each acquisition pool (SUF ¶ 107), the WLTD's traders forced its diligence teams to review unscientifically-drawn samples of as little as 10 percent of the acquisition pools, sometimes contrary to the diligence teams' recommendations (*e.g.*, SUF ¶ 114).  As even Merrill Lynch's own proffered expert acknowledges, these processes were not designed to achieve a level of statistical significance.  Little Report ¶ 58.  There is thus no evidence that the WLTD chose samples of loans to provide a systematic basis to verify the originator's representations as to the quality of the loans.  *See In re Worldcom*, 346 F. Supp. 2d at 678.

> *Third*, the information the WLTD diligence teams did glean from their samples revealed red flags that the diligence teams routinely ignored.  This is especially true for the WLTD's "adverse" sample, which was supposed to consist of the riskiest loans that fell outside, or at the edges of, an originator's guidelines.  SUF ¶ 130.  However, there were no regular criteria for picking adverse loans, a process that the WLTD viewed as "an art not a science" (SUF ¶ 130).  Moreover, the WLTD did not examine any loans with those risky characteristics in the 75 percent to 80 percent of the pool that were outside of the sample.  SUF ¶¶ 133-34.  This is a textbook example of an ignored red flag: the WLTD had no confidence in the quality of the loans at the edge of an originator's guidelines, *see In re WorldCom*, 346 F. Supp. 2d at 673, but then refused to "look deeper and question more" about such loans outside of its samples with similar

characteristics, *id.* at 677.  Instead, the WLTD did the opposite, simply securitizing all other such

risky loans, without further review, if those loans were not within its "adverse" sample.

Moreover, far from "inquir[ing] systematically" into these loans, *id.* at 678 (quotation marks

omitted), the WLTD never developed standard criteria for choosing the loans that were selected

in the adverse portion of its samples.  *E.g.*, SUF ¶ 133.

     *Fourth*, the WLTD's "random" sample was equally shoddy.  Initially, the WLTD did not

actually choose loans at random in any type of systematic, consistent way that could be

extrapolated to the entire acquisition pool.  Rather, in some cases, the WLTD used a glorified

system of "eenie-meenie-miney-mo," picking every tenth loan from a spreadsheet (SUF ¶ 129),

whereas in others the WLTD used a random number generator (SUF ¶ 128).  There is no

evidence that MLPFS ever attempted to reconcile or standardize such methods; to the contrary,

Merrill Lynch's own internal audit concluded in March 2007 that "[t]he sampling methodology

supporting the amount of loans sampled during pre-settlement due diligence has not been

documented."  SUF ¶ 49.  Likewise, there is no evidence that the WLTD conducted any checks

at all—such as determining a confidence interval or whether the sample adequately represented

the acquisition pool in terms of geography, FICO score, etc., *see FHFA v. JPMorgan Chase &*

*Co.*, 2012 WL 6000885, at *6 (S.D.N.Y. Dec. 3, 2012)—when conducting its so-called

sampling.  SUF ¶ 134.  This statistically unsupported approach to "random" sampling is not a

reasonable investigation under the commonly understood meaning of that term.  *See In re*

*WorldCom*, 346 F. Supp. 2d at 678.  Further, there is no evidence Merrill Lynch responded to the

presence of a material breach rate in such a sample by systematically performing the additional

diligence that would have been necessary to identify and remove defective loans from the

remainder of the loan pool prior to securitization.  There is also no evidence that those

acquisition-stage samples, regardless of size, provided statistically representative diligence results that could be extrapolated to the full SLGs.  Nor could there be any such evidence because the SLGs were often populated with loans from different acquisition pools where the originators, sample sizes, loan selection, and types of diligence conducted among those acquisition pools varied.  SUF ¶ 86.

In light of MLPFS's complete integration with MLMI, the numerous red flags showing that its acquisition diligence was untrustworthy, and the questions raised about the quality of the loans from the originators in which MLPFS had an ownership interest, it was unreasonable as a matter of law for the WLTD to conduct limited, *ad hoc* diligence that was not—and, as a matter of basic statistics, could not have been, *see* n.36, *supra*—extrapolated to the rest of the acquisition pool, let alone to the SLGs that MLMI actually securitized.  Summary judgment that MLPFS has no due diligence defense on the 47 WLTD Securitizations is therefore appropriate.

## F.  MLPFS Conducted Only Cursory Diligence—And Sometimes No Diligence At All—On The Third-Party Securitizations

There is likewise no genuine dispute of material fact that MLPFS did not conduct a reasonable investigation into the loans underlying the Third-Party Securitizations, let alone have a reasonable ground to believe that the representations regarding the loans in the Prospectus Supplement for each Securitization was accurate.  *See In re WorldCom*, 346 F. Supp. 2d at 679. As established above, there is no evidence that MLPFS's diligence was even designed to verify the accuracy of statements in the Prospectus Supplements issued for Third-Party Securitizations. *See* Part II.C, *supra*.   Like the WLTD Securitizations, there is no evidence that MLPFS's diligence employees investigated the statements in the Prospectus Supplements for the Third-Party Securitizations, nor is there evidence that they made any attempt to verify the accuracy of the statements contained therein.  SUF ¶¶ 168-72.  MLPFS therefore cannot meet its burden of

establishing that it had reasonable grounds to believe that "the statements" in the Prospectus Supplements were accurate as required by Section 11.  *See* 15 U.S.C. § 77k(b)(3)(A).

MLPFS likewise created the Third-Party Securitizations subject to the same unwritten, *ad hoc* diligence procedures employed for the WLTD Securitizations, using the same untrusted vendors, with the same inadequate staff, all the while limiting their diligence based on the same economic constraints the WLTD traders imposed.  *See* Part II.E, *supra*.  The diligence on Third-Party Securitizations was thus equally deficient as that for the WLTD Securitizations.  SUF ¶ 97.

Furthermore, in spite of having less knowledge of the loans in the Third-Party Securitizations, the WLTD conducted **less** diligence than it did for the WLTD or SURF Securitizations.  The WLTD's sample sizes for Third-Party Securitizations were typically 10 percent or less of the SLGs[38] (SUF ¶ 124), rather than the 20-25 percent of each acquisition pool for the WLTD Securitizations (SUF ¶ 108).  In fact, for the six subprime Third-Party Securitizations, "sample" sizes were between 1 percent and 7 percent for four of the Securitizations, and no diligence was performed on one (the OOMLT 2007-1 Securitization).[39] As with the WLTD Securitizations, there is no evidence that the WLTD chose samples of loans for Third-Party Securitizations because they provided any statistically-based comfort regarding the representations related to the loans outside the sample.  *See* Part II.E.4, *supra*.

For five of the six Alt-A Third-Party Securitizations,[40] according to Merrill Lynch's proffered expert WLTD did not select a random diligence sample at all.[41]  Instead, the WLTD relied entirely on an *ad hoc* adverse sample using inconsistent criteria, *see* Part II.E.4, *supra*, even though a non-random, purely adverse sample cannot be representative of loans outside of

---

[38]   *See* Little Report ¶¶ 103-04; Exs. 6A-B.
[39]   Cipione Decl. Ex. 1.  Less than 13 percent of the loans in the SLG were diligenced on the final subprime Third-Party Securitization.
[40]   INDX 2006-AR5, INDX 2006-AR7, INDX 2007-FLX4, INDX 2007-FLX5, and INDX 2007-FLX6.
[41]   *See* Little Report Ex. 6B.

that sample and cannot be extrapolated to the entire pool.  Compounding that problem, the WLTD did not "look deeper and question more" about the remaining loans with similar adverse characteristics in the pool, but rather simply securitized the loans that fell outside the "adverse" sample.  *See In re WorldCom*, 346 F. Supp. 2d at 677 (requiring underwriter conducting a due diligence investigation to look deeper and question more when confronted with red flags).

Because the WLTD's cursory examination of such a small number of loans says nothing about the overall quality of the loans in the Third-Party Securitizations, its efforts are no better than the "blind reliance on others" that "does not substitute for the due diligence that defendants must demonstrate to avoid Section 11 liability."  *In re Livent*, 355 F. Supp. 2d at 738 (citing *BarChris*, 283 F. Supp. at 684-85).  As there is no evidence that MLPFS conducted "a thorough or searching inquiry" into the statements in the Prospectus Supplements for the Third-Party Securitizations (or had any reasonable ground to believe in the truth of those statements), summary judgment that MLPFS has no due diligence defense is also appropriate for the Third-Party Securitizations.  *In re WorldCom*, 346 F. Supp. 2d at 678 (quotation omitted).

### G.    For The SURF Securitizations, MLPFS Ignored Red Flags In Purchasing Non-Conforming Loans And Distrusting Its Diligence Vendor

MLPFS cannot present a successful due diligence defense for the SURF Securitizations because MLPFS was fully intertwined with MLMI, and thus incapable of conducting an independent review.  *See* Part II.A, *supra*.  Even if MLPFS were independent, contrary to fact, FHFA would be entitled to summary judgment because MLPFS often conducted diligence on the securitized loans many months before the Prospectus Supplements became effective, and it did not investigate the statements in the Prospectus Supplements.  *See* Parts II.B-II.C, *supra*.

Because of SURF's use of "negotiated criteria," MLPFS's diligence on the SURF Securitizations was even more removed from the Prospectus Supplements than it was for the

WLTD and Third-Party Securitizations.  The Prospectus Supplements for each of the SURF

Securitizations represent that "[a]ll of the Mortgage Loans were originated generally in

accordance with SURF's Underwriting Guidelines."  SUF ¶ 203.  In cases where negotiated

criteria applied, however, SURF performed diligence not to determine if the loans complied with

SURF's guidelines, but rather with the undisclosed negotiated criteria.  SUF ¶ 200.  In fact,

SURF acquired some pools where more than half of the loans failed to comply with the

underwriting guidelines published in SURF's Seller Guide.  SUF ¶¶ 204-06.  SURF's diligence

on "negotiated criteria" loans could not as a matter of law confirm the veracity of the

"statements" in the Prospectus Supplements.  15 U.S.C. § 77k(b)(3)(A).

     SURF also ignored red flags about the quality of its diligence vendor, Hanover.  The

settled rule is that, "[i]f a 'prudent man in the management of his own property,' 15 U.S.C.

§ 77k(c), upon reading the [portions of the registration statement and other public information]

would have questioned the accuracy of the figures, then those figures constituted a red flag and

imposed a duty of investigation on the [u]nderwriter."  *In re WorldCom*, 346 F. Supp. 2d at 679.

Here, however, when another Merrill Lynch employee asked whether Ms. Lacey, the head of

SURF's diligence team, would recommend Hanover, Ms. Lacey declined to do so, citing

concerns about the quality of Hanover's services.  SUF ¶¶ 217-18.  SURF's lack of confidence in

Hanover is a textbook red flag that required SURF to "look deeper and question more" when

reviewing Hanover's data.  *In re WorldCom*, 346 F. Supp. 2d at 677 (quotation marks omitted).

     Yet there is no evidence that SURF's diligence team conducted any loan-file review of

loans Hanover graded as compliant to see if those grades were correct.  To the contrary, SURF's

diligence's team told its traders that, in buying loans from originators, the traders could "do what

you need to do and we will back you up" (SUF ¶ 216).  There is no indication that SURF did

anything other than succumb to the "competitive pressures" that ostensibly "require[d]" SURF "to include more loans" in the pools it was purchasing to securitize.  SUF ¶ 216.  *But see In re WorldCom*, 346 F. Supp. 2d at 669 (noting that an underwriter "is never compelled to proceed with an offering *until [it] has accomplished [its] due diligence*" (quotation marks omitted)).

SURF's failure to change or expand its diligence procedures when purchasing large quantities of loans that did not meet its guidelines, despite its concerns about the accuracy of its diligence vendor's analyses, shows that MLPFS cannot prove a due diligence defense for the SURF Securitizations.  *See In re Livent*, 355 F. Supp. 2d at 736 (granting plaintiff's motion for summary judgment on defendants' due diligence defense because "far from seeking to ensure that [a] transaction was properly accounted for in the Registration Statement, [the defendants] instead actively facilitated its improper accounting treatment").

## III.   MLPFS AND MLMI DID NOT EXERCISE REASONABLE CARE AS A MATTER OF LAW

Likewise, summary judgment is appropriate on MLMI and MLPFS's "reasonable care" defense under Section 12 of the Securities Act or under the Virginia and D.C. Blue Sky laws, because neither defendant ever analyzed the loans in each Securitization's actual SLGs, reviewed the statements in the Prospectus Supplements, or did anything more than rely on the untrustworthy assurances of originators and third-party due diligence firms.[42]  While Section 12's "reasonable care" defense is less "exacting" than Section 11's "reasonable

---

[42]   Both the D.C. and the Virginia Blue Sky Acts contain language that is identical to Section 12's "reasonable care" defense, *see* D.C. Code § 31-5606.05(a)(1)(B); Va. Code Ann. § 13.1-522(A), and this Court has held that, where the statutory language in the two Blue Sky Acts is identical to Section 12, "the D.C. and Virginia securities laws are generally interpreted in accordance," *FHFA v. Bank of America Corp.*, 2012 WL 6592251, at *7 n.8 (S.D.N.Y. Dec. 18, 2012).  *See also FHFA v. HSBC N. Am. Holdings Inc.*, --- F. Supp. 2d ----, 2013 WL 6588249, at *2, *4 (S.D.N.Y. Dec. 16, 2013) (recognizing that both Blue Sky Acts contain the identical "reasonable care" defense as in Section 12).   The same analysis under Section 12 therefore applies to the Blue Sky Act claims.  *See MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/Am. Express, Inc.*, 886 F.2d 1249, 1255 n.3 (10th Cir. 1989).  This Court has also already ruled that neither MLMI or MLPFS has a loss causation defense under the either Blue Sky Act.  *HSBC N. Am. Holdings*, 2013 WL 6588249, at *4.

investigation" requirement, *In re WorldCom*, 346 F. Supp. 2d at 663, there is substantial overlap between the two: the Second Circuit has recognized that a defendant fails to exercise reasonable care where it fails to "conduct[] an ongoing investigation of [the issuer's] financial condition." *Franklin Sav. Bank of N.Y. v. Levy*, 551 F.2d 521, 527 (2d Cir. 1997); *see In re Software Toolworks Inc.*, 50 F.3d at 621 (because Section 11 standard is "similar, if not identical" to Section 12 standard, "analysis of each on summary judgment is the same").

Consequently, a failure to conduct a "reasonable investigation" under Section 11 constitutes, in almost all cases, a lack of "reasonable care" under Section 12. *See, e.g.*, *Franklin Sav. Bank*, 551 F.2d at 527 (underwriter "failed to exercise reasonable professional care in assembling and evaluating the financial data … no matter how honestly but mistakenly [underwriter's belief in the accuracy of the financial data was] held"); *Univ. Hill Found.*, 422 F. Supp. at 902 (defendant, treated as underwriter under Section 11, could not meet Section 12 "reasonable care" defense where its "exclusive reliance on publicly available data and the unverified representations of management [was] inadequate to meet [defendant's] obligations to the investing public"); *cf. In re Metlife Demutualization Litig.*, 262 F.R.D. 217, 235 (E.D.N.Y. 2009) ("A defendant may show 'reasonable care' [under Section 12] by introducing evidence that the allegedly fraudulent prospectus was the result of reasonable investigation.").

Under any conception of the "reasonable care" defense, there is no genuine issue of material fact that MLPFS has no such defense. *First*, as under Section 11, MLPFS must be held to the highest standard of proof under Section 12 because it was deeply intertwined with MLMI's operations. *See, e.g.*, *Heffernan v. Pac. Dunlop GNB Corp.*, 965 F.2d 369, 373 (7th Cir. 1992) ("The defendant's position gives content to the term 'reasonable care.' For instance, reasonable care for a director requires more than does reasonable care for an individual owning a

few shares of stock with no other connection to the corporation."); *Junker v. Crory*, 650 F.2d 1349, 1361 (5th Cir. 1981) (underwriter's "familiar[ity] with the financial operations of" the issuers meant that "the exercise of reasonable care would have required him to seek an appraisal or at least some knowledgeable estimate of the [issuer's] property in assessing its true value"). Yet despite MLPFS's complete control over MLMI, it never sought a "knowledgeable estimate" of the loans that MLMI securitized, as neither SURF's nor WLTD's diligence procedures assessed the compositions of the loans backing the SLGs, rather than the acquisition loan pools. *See* Parts II.B, II.D, *supra*.

 *Second*, MLPFS did not exercise "reasonable care" because its diligence employees never examined the Prospectus Supplements to determine whether they contained "an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements." 15 U.S.C. § 77*l*(a)(2).  Moreover, because MLPFS analyzed loans only at the acquisition stage, as described in Part II.C, *supra*, and did not avail itself of relevant information arising in the months prior to securitization, "[i]ts failure to inquire more closely into the basis for the statements [made by the originators] … rendered [MLPFS's] ongoing … investigation unreasonable, and its representation to the [GSEs] untrue within the meaning of § 12[a](2)." *Univ. Hill Found.*, 422 F. Supp. at 902; *see Franklin Sav. Bank*, 551 F.2d at 527 (underwriter must "conduct[] an ***ongoing*** investigation" to take advantage of reasonable care defense (emphasis added)); *In re Software Toolworks*, 50 F.3d at 625-26 & n.2 (failure to analyze intra-quarterly data prior to effective date vitiated underwriter's Section 11 and 12 defenses).

 *Third*, MLPFS ignored numerous red flags that should have stripped it of its confidence in the data it was getting from originators and its third-party diligence firms, *see* Part II.E, *supra*, and its failure to investigate these storm warnings vitiates MLPFS's reasonable care defense just

as surely as MLPFS's due diligence defense.  *See Franklin Sav. Bank*, 551 F.2d at 527 (unreasonable for underwriter to vouch for quality of securities "particularly in view of the worsening condition of [the issuer]"); *In re Software Toolworks*, 50 F.3d at 626 (no summary judgment on defendants' "due diligence" and "reasonable care" defenses when underwriters "did little more than rely on [the issuer's] assurances that the transactions were legitimate" despite red flags that they were not).  In sum, whatever differences there may be between the "reasonable care" and "due diligence" defenses, "the analysis of each on summary judgment is the same," *id.* at 621, and MLPFS is not entitled to either.

*Finally*, MLMI is also not entitled to a reasonable care defense.  There is no evidence that MLMI was even capable of exercising reasonable care, since it "was not functioning as an operating company where it had other business activities or functions, nor did it have any employees or really act as an operating company."  SUF ¶ 8.  And to the extent that MLMI was capable of any actions, because MLPFS's employees controlled MLMI (SUF ¶¶ 9-10), MLPFS's failure to conduct reasonable care is also fully attributable to MLMI.  Even if MLMI were somehow able to take actions independent of MLPFS, there is no evidence that MLMI ever asked any questions or inquired into any aspect of the quality of the loans it was securitizing and MLPFS was selling.  *Cf. Demarco v. Edens*, 390 F.2d 836, 842-43 (2d Cir. 1968) (finding reasonable care where issuer conducted in-depth inquiry into quality of underwriter).  MLMI therefore is also fully liable under Section 12 and the Virginia and D.C. Blue Sky Acts.

## CONCLUSION

For the reasons set forth above, FHFA respectfully requests that the Court grant its motion for partial summary judgment.

DATED:   New York, New York
               February 14, 2014

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP


By: /s/ Philippe Z. Selendy
    Philippe Z. Selendy
    Sascha N. Rand
    Manisha M. Sheth
    Andrew R. Dunlap

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000

*Attorneys for Plaintiff Federal Housing
Finance Agency, as Conservator for Fannie
Mae and Freddie Mac*

62

**Appendix 1:  The Securitizations**

**The WLTD Securitizations**

| No. | Securitization | Tranche | SLG | Sponsor/Seller | Depositor | Lead/Co-Lead Underwriter | Collateral Type |
|---|---|---|---|---|---|---|---|
| 1. | FFMER 2007-1 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 2. | FFMER 2007-2 | A1 | Group I | First Franklin Financial Corporation | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 3. | FFMER 2007-3 | A1A | Group I | First Franklin Financial Corporation | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
|  |  | A1C | Group I |  |  |  |  |
|  |  | A1D | Group I |  |  |  |  |
|  |  | M11 | Group I |  |  |  |  |
|  |  | M21 | Group I |  |  |  |  |
|  |  | M31 | Group I |  |  |  |  |

| No. | Securitization | Tranche | SLG | Sponsor/Seller | Depositor | Lead/Co-Lead Underwriter | Collateral Type |
|---|---|---|---|---|---|---|---|
| | | M41 | Group I | | | | |
| 4. | FFMER 2007-4 | 1A | Group I | First Franklin Financial Corporation | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| | | 1M1 | Group I | | | | |
| | | 1M2 | Group I | | | | |
| | | 1M3 | Group I | | | | |
| 5. | FFMER 2007-5 | 1A | Group I | First Franklin Financial Corporation | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 6. | FFMER 2007-H1 | 1A1 | Group I | First Franklin Financial Corporation | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 7. | FFML 2005-FF12 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 8. | FFML 2006-FF18 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |

| No. | Securitization | Tranche | SLG | Sponsor/Seller | Depositor | Lead/Co-Lead Underwriter | Collateral Type |
|---|---|---|---|---|---|---|---|
| 9. | FFML 2007-FF1 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 10. | FFML 2007-FF2 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 11. | MANA 2007-A1 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Prime/Alt-A |
| 12. | MANA 2007-A2 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Prime/Alt-A |
|  |  | A2A | Group 2 |  |  |  |  |
| 13. | MANA 2007-A3 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Prime/Alt-A |

| No. | Securitization | Tranche | SLG | Sponsor/Seller | Depositor | Lead/Co-Lead Underwriter | Collateral Type |
|---|---|---|---|---|---|---|---|
| 14. | MLMI 2005-A8 | A2A | Group 2 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Prime/Alt-A |
| | | A2B1 | Group 2 | | | | |
| 15. | MLMI 2005-AR1 | A2 | Group 2 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 16. | MLMI 2005-HE2 | A1A | Group 1 | Merrill Lynch Mortgage Capital, Inc. and Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| | | A1B | Group 1 | | | | |
| 17. | MLMI 2005-HE3 | A1A | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 18. | MLMI 2006-A3 | IIA1 | Group 2 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Prime/Alt-A |
| 19. | MLMI 2006-AF2 | AV1 | Group 2 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Prime/Alt-A |
| 20. | MLMI 2006-AHL1 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |

| No. | Securitization | Tranche | SLG | Sponsor/Seller | Depositor | Lead/Co-Lead Underwriter | Collateral Type |
|---|---|---|---|---|---|---|---|
| 21. | MLMI 2006-AR1 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 22. | MLMI 2006-FF1 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 23. | MLMI 2006-FM1 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 24. | MLMI 2006-HE1 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 25. | MLMI 2006-HE4 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 26. | MLMI 2006-HE5 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 27. | MLMI 2006-HE6 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 28. | MLMI 2006-MLN1 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 29. | MLMI 2006-OPT1 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |

| No. | Securitization | Tranche | SLG | Sponsor/Seller | Depositor | Lead/Co-Lead Underwriter | Collateral Type |
|---|---|---|---|---|---|---|---|
| 30. | MLMI 2006-RM1 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 31. | MLMI 2006-RM2 | A1A | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 32. | MLMI 2006-RM3 | A1A | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 33. | MLMI 2006-RM4 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 34. | MLMI 2006-RM5 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 35. | MLMI 2006-WMC1 | A1A | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 36. | MLMI 2006-WMC2 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 37. | MLMI 2007-HE1 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 38. | MLMI 2007-HE2 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |

| No. | Securitization | Tranche | SLG | Sponsor/Seller | Depositor | Lead/Co-Lead Underwriter | Collateral Type |
|---|---|---|---|---|---|---|---|
| 39. | MLMI 2007-MLN1 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 40. | OWNIT 2005-4 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 41. | OWNIT 2005-5 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 42. | OWNIT 2006-2 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 43. | OWNIT 2006-3 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 44. | OWNIT 2006-4 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 45. | OWNIT 2006-5 | A1B | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
|  |  | A1A | Group 1 |  |  |  |  |
| 46. | OWNIT 2006-6 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |

| No. | Securitization | Tranche | SLG | Sponsor/Seller | Depositor | Lead/Co-Lead Underwriter | Collateral Type |
|-----|----------------|---------|-----|----------------|-----------|--------------------------|-----------------|
| 47. | OWNIT 2006-7 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |

**The Third-Party Securitizations**

| No. | Securitization | Tranche | SLG | Sponsor/Seller | Depositor | Lead/Co-Lead Underwriter | Collateral Type |
|---|---|---|---|---|---|---|---|
| 1. | ARSI 2005-W4 | A1B | Group 1 | Ameriquest Mortgage Company | Argent Securities, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
|  |  | A1A2 | Group 1 |  |  |  |  |
|  |  | A1A3 | Group 1 |  |  |  |  |
| 2. | ARSI 2006-M1 | A1 | Group 1 | Ameriquest Mortgage Company | Argent Securities, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 3. | CBASS 2006-CB8 | A1 | Group I | Credit-Based Asset Servicing and Securitization, LLC | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 4. | FMIC 2006-3 | 1A | Group 1 | Fieldstone Investment Corporation | Fieldstone Mortgage Investment Corporation | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 5. | INDX 2005-AR33 | 2A1 | Group 2 | IndyMac Bank, F.S.B | IndyMac MBS, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Alt-A |
| 6. | INDX 2006-AR5 | 1A1 | Group 1 | IndyMac Bank, F.S.B | IndyMac MBS, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Alt-A |

| No. | Securitization | Tranche | SLG | Sponsor/Seller | Depositor | Lead/Co-Lead Underwriter | Collateral Type |
|---|---|---|---|---|---|---|---|
| 7. | INDX 2006-AR7 | 2A1 | Group 2 | IndyMac Bank, F.S.B | IndyMac MBS, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Alt-A |
| 8. | INDX 2007-FLX4 | 1A1 | Group 1 | IndyMac Bank, F.S.B | IndyMac MBS, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Alt-A |
| 9. | INDX 2007-FLX5 | 1A1 | Group 1 | IndyMac Bank, F.S.B | IndyMac MBS, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Alt-A |
| 10. | INDX 2007-FLX6 | 1A1 | Group 1 | IndyMac Bank, F.S.B | IndyMac MBS, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Alt-A |
| 11. | OOMLT 2007-1 | IA2 | Group 1 | Option One Mortgage Corporation | Option One Mortgage Acceptance Corporation | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| | | IA1 | Group 1 | | | | |
| 12. | OWNIT 2006-1 | AV | Group 1 | Credit-Based Asset Servicing and Securitization, LLC | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |

**The SURF Securitizations**

| No. | Securitization | Tranche | SLG | Sponsor/Seller | Depositor | Lead/Co-Lead Underwriter | Collateral Type |
|---|---|---|---|---|---|---|---|
| 1. | SURF 2005-AB3 | A1A | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 2. | SURF 2005-BC3 | A1A | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 3. | SURF 2005-BC4 | A1A | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 4. | SURF 2006-AB2 | A1 | Group I | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 5. | SURF 2006-AB3 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 6. | SURF 2006-BC1 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 7. | SURF 2006-BC2 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 8. | SURF 2006-BC3 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 9. | SURF 2006-BC4 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |

| No. | Securitization | Tranche | SLG | Sponsor/Seller | Depositor | Lead/Co-Lead Underwriter | Collateral Type |
|---|---|---|---|---|---|---|---|
| 10. | SURF 2006-BC5 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 11. | SURF 2007-AB1 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 12. | SURF 2007-BC1 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |
| 13. | SURF 2007-BC2 | A1 | Group 1 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Merrill Lynch, Pierce, Fenner & Smith, Inc. | Subprime |